**GROVE PRESS, INC., et al., Plaintiffs,**

v.

**Anthony B. FLASK et al., Defendants.**

No. C 69-735.

United States District Court,
N. D. Ohio,
Eastern Division.
March 10, 1970.

Berkman, Gordon & Kancelbaum, Cleveland, Ohio, for plaintiffs.

Vincent E. Gilmartin, Mahoning County Prosecutor, Youngstown, Ohio, for defendants.

Before CELEBREZZE, Circuit Judge, BATTISTI, Chief District Judge, and GREEN, District Judge.

CELEBREZZE, Circuit Judge.

This action was originally filed on September 16, 1969. Plaintiffs seek declaratory relief on the constitutionality of certain state statutes, injunctive relief from the allegedly unlawful conduct of certain public officials with regard to the film, "I Am Curious (Yellow)," and a declaratory judgment that the film is protected constitutional matter.

After the filing of the petition, the plaintiffs sought an immediate temporary restraining order pending disposition of the case, which was denied. The District Court set September 23, 1969 for a hearing on the application for the preliminary injunction. After initial oral arguments, the case was dismissed without prejudice for failure to seek a three-judge District Court in conformity with Sections 2281, 2284 of Title 28 of the United States Code. On October 20, 1969, the Court of Appeals for the Sixth Circuit reversed the District Court dismissal, 417 F.2d 1062, and remanded the case with instructions to "proceed with dispatch" on an action pursuant to Sections 2281, 2284 of Title 28 of the United States Code. By stipulation of counsel, the status quo was to be preserved "until the three-Judge Court has determined the case."

Plaintiffs in this matter are several: Grove Press, Inc., a New York corporation which is owner and distributor of the film "I Am Curious (Yellow)," and has contracted with exhibitors in several cities in the United States for the exhibition of the film; State-Youngstown Theater Corporation, an Ohio corporation which owns and operates the State Theater; and Mrs. Patricia Horne, an adult resident of Greater Youngstown Ohio area who frequently attends motion pictures and would like to have the opportunity to see the challenged film in the Youngstown area. In the original complaint Mrs. Horne was described as seeking relief on behalf of herself as an individual and as a representative of a class of all others similarly situated. No evidence was introduced to prove the existence of a class. Rule 23, Federal Rules of Civil Procedure.

Defendants in this case are the State of Ohio, represented by the Mahoning County Prosecuting Attorney, the Law Director of the City of Youngstown, acting as a private citizen of Mahoning County, and the Mayor and Chief of Police of the City of Youngstown. While in the initial complaint Messrs. Vincent Gilmartin, Patrick Mellilo, Anthony B. Flask, and John Terkesky were the named defendants respectively, the parties have stipulated that three substitutions be made as a result of successions in office: Messrs. Nicholas Manos, Law Director; Jack C. Hunter, Mayor; and Donald Baker, Chief of Police.

The facts are stipulated. In summary, the State-Youngstown Theater Corporation contracted with Grove Press, Inc. to exhibit the film, "I Am Curious (Yellow)" at the State Theater in Youngstown, Ohio, for an indefinite period commencing September 17, 1969. The contract specifically provided that the State-Youngstown Theater Corporation would refuse admittance to all persons under 18 years of age and refrain from advertising the film in a lascivious or pandering manner.

On September 11, 1969, the State Theater received a letter from the Mayor of the City of Youngstown and the Mahoning County Prosecutor expressing their opinion that the movie "I Am Curi-

ous (Yellow) * * * is lewd, indecent, lascivious and obscene" and that the Ohio Revised Code §§ 3767.01, 3767.03 to 3767.06 "authorize an action to abate a nuisance against the owner, agent, or lessee of any interest in such nuisance." The letter indicates the "dire consequences which may follow" the exhibition of "any lewd, indecent, lascivious or obscene films" under the aforementioned statutory authority. The contents of that letter were publicized by the news media.

On September 17, 1969, one day after this action had been filed in the District Court the Youngstown City Council enacted a series of ordinances directed towards the regulation of obscenity within its jurisdiction, including Ordinance No. 79703.

That very day, the film, "I Am Curious (Yellow)" was exhibited on two separate occasions to members of the general public, police officers and certain of defendants, including the Mahoning County Prosecuting Attorney. At the conclusion of each exhibition, the projectionist of the film was arrested under the authority of the Ordinance by Youngstown police officers. On each occasion, the reels of film were seized and retained by the police pursuant to each arrest, but without search warrant or other judicial authority.

On September 18, 1969, the State of Ohio by the Mahoning County Prosecuting Attorney, and the Law Director of the City of Youngstown, acting as a private citizen of Mahoning County filed suit under the Ohio nuisance statutes, Ohio Revised Code § 3767.01 et seq., in the Court of Common Pleas of Mahoning County. Their petition alleged:

"that the film, 'I am Curious (Yellow)' is lewd, lascivious, indecent and obscene in that said film depicts several clear and unimpeded views depicting acts of sexual intercourse between a male and a female, a scene depicting cunnilingus and fellatio; and a fantasy scene depicting castration, as well as numerous other sordid and obscene situations too numerous to enumerate."

Appropriate statutory relief was sought to abate the alleged nuisance of the exhibition of an obscene film, including an ex parte restraining order to prevent any person "from removing, using, or in any manner interfering with the personal property and contents of the State Theater." The ex parte restraining order was denied. A hearing was set concerning the possible issuance of a temporary injunction for September 25, 1969. On September 25, the hearing was continued until September 29 because the defendants in that case had neither been given nor waived the full five days' notice required by the statute. The hearing set for September 29, was not had because of agreement of counsel to maintain the status quo pending the decision of this Court.

Also set for September 29, was a trial on the criminal charges brought under the City of Youngstown ordinances against the two projectionists arrested at the State Theater. The City of Youngstown refused to agree to a continuance on that matter even though the suits under the Ohio nuisance statutes were pending on the docket for September 29. The Youngstown Municipal Court also refused to grant a continuance; but the trial was not had because counsel agreed to maintain the status quo pending the resolution by this Court.

This Court has statutory jurisdiction to consider their constitutional claims insofar as they constitute an actual federal justiciable controversy. 28 U.S.C. §§ 2281, 2284; 28 U.S.C. §§ 2201, 2202; 42 U.S.C. § 1983.

I

The primary contention of plaintiffs is that the Ohio nuisance laws are unconstitutional on their face and as applied to the regulation of obscene matter. Ohio Revised Code §§ 3767.01–3767.11.

The Ohio Revised Code establishes a statutory scheme for the regulation of

nuisances, including places in which lewd or obscene films are exhibited. It provides for temporary injunctive relief upon application and after a hearing within ten days after filing of a suit. It also permits a judge to "issue an ex parte restraining order, restraining the defendant and all other persons from removing or in any manner interfering with the personal property and contents of the place. * * *" And if the material is found to be obscene after a trial, a permanent injunction may issue. Further, certain penal provisions may apply: including, the levying of special taxes and liens; the voiding of leases; and the closing of places where nuisances are committed for up to one year, subject to certain ameliorating or modifying provisions including the "good faith" of the owner of the place. O.R.C. § 3767.01–11.

Plaintiffs allege six interrelated defects in Ohio's statutory scheme for the prevention and abatement of nuisances as applied to the delicate problem of determining whether material is constitutionally protected.

First, plaintiffs allege that the statute which prohibits the exhibition of "lewd, indecent, lascivious or obscene films," is overly broad. Ohio Revised Code § 3767.01. We must assume "that state courts and prosecutors will observe constitutional limitations as expounded by [the United States Supreme] Court." Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct 1116, 14 L.Ed.2d 22 (1943). In a recent criminal prosecution involving the construction of the words "obscene, iewd or lascivious" the Ohio Supreme Court held itself bound to construe the language consistent with the prevailing constitutional authority of A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), State v. Mazes, 7 Ohio St.2d 136, 218 N.E.2d 725 (1966) Ohio Revised Code § 2905.-34.

■ In Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) the United States Supreme Court held that a federal statute making punishable the mailing of material that is "obscene, lewd, lascivious or filthy * * or other publications of indecent character" was "sufficiently precise" to meet the constitutional standards of due process. "These words," the Court observed, "applied according to the proper standard for judging obscenity * * *, give adequate warning of the conduct proscribed and mark * * * 'boundaries sufficiently distinct for judges and juries fairly to administer the law'." 354 U.S. at 491, 77 S.Ct. at 1313. While a nuisance statute is admittedly an imprecise tool with which to administer the regulation of obscenity, the definition of "lewd, indecent, lascivious or obscene films" contained within the statute does not, in the words of *Roth*, "offend the constitutional safeguards against convictions based upon protected material, or fail to give men in acting adequate notice of what is prohibited." 354 U.S. at 492, 77 S.Ct. at 1313. The Ohio statutes are not overly broad.

■ Second, the plaintiffs allege that the statutory scheme is unconstitutional in that it may be lacking scienter: an essential ingredient in the governmental regulation of obscenity. Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L. Ed.2d 205 (1961). If necessary, the Ohio nuisance statutes may be construed as requiring scienter. The Ohio State Supreme Court has indicated it will require scienter in any obscenity statute imposing criminal penalties. State v. Mazes, 7 Ohio St.2d 136, 218 N.E.2d 725 (1966); City of Cincinnati v. Marshall, 172 Ohio St. 280, 175 N.E.2d 178 (1961). Thus, we may fairly assume that the statute will be construed "in a constitutional sense" by the Ohio courts and that prosecutors may be expected to "observe constitutional limitations as expounded by this Court." Redrup v. New York, 386 N.S. 767, 769, 87 S.Ct. 1414, 18 L. Ed.2d 515 (1967); A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 418, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966); Dom-

browski v. Pfister, 380 U.S. 479, 485, 85 S.Ct. 1116, 1120, 14 L.Ed.2d 22 (1966); Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943).

■ Third, the plaintiffs allege that the statute unlawfully places the burden of proof of the non-obscenity of the material on the accused. Ohio Revised Code §§ 3767.04 to 3767.06. While the statute makes prior convictions for nuisance prima facie evidence of nuisance in a subsequent action, we do not believe that this language will be applied to a proceeding when the nuisance attacked is the exhibition of obscene materials. We shall assume that Ohio's state courts will so construe the statute. Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

■ Fourth, the plaintiffs allege that material may be restrained by an ex parte injunction against nuisances without a prior adversary determination of its obscenity. Any such "precensorship" of materials would be questionable. Teitel Film Corp. v. Cusack, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968). "[R]estraint imposed in advance of a final judicial determination on the merits must * * * be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution." Freedman v. Maryland, 380 U.S. 51, 59, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965). And only a "judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression * * * to impose a valid final restraint." 380 U.S. at 58, 85 S.Ct. at 739. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964); Marcus v. Search Warrants, etc., 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed. 2d 1127 (1961). The Ohio statutes however do not permit "ex parte injunctions against nuisances" to issue without the opportunity for a prior adversary hearing. Ohio Revised Code § 3767.04.

The Ohio statutory scheme provides for a full adversary hearing prior to the issuance of any preliminary injunction. Prior to the hearing the statute does specifically provide for an "ex parte restraining order" to prevent the "defendants or other persons from removing or in any manner interfering with the personal property and contents of the place where such nuisance is alleged." Ohio Revised Code §§ 3767.04–.05. The statutory "ex parte order" is limited in scope to prevent evidence from being destroyed and to retain the status quo pending a hearing. It is not to be used as an injunction against exhibition, as the Ohio Court of Common Pleas demonstrated when construing the statute regarding the exhibition of this very film, "I Am Curious (Yellow)." Mahoning County Common Pleas Court Case No. 188990, September 18, 1969.

■ Fifth, the plaintiffs allege that the Ohio statutory scheme is deficient in that it fails to make a distinction between "private possession" and "public dissemination" of obscene matter. To the extent that the nuisance statutes do literally apply with equal vigor to "private possession" and "public dissemination" of obscene matter, they are inconsistent with the holding of Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). This language may be severed. Ohio Revised Code § 1.13. The statutory scheme should be forthwith construed consistently with the holding of Stanley that "mere possession by the individual in the privacy of one's home" of obscene matters is a constitutionally protected activity.

■ Sixth, the plaintiffs attack the state statutory scheme as imposing unnecessarily broad and sweeping penalties on the distribution of obscene matter in order to chill the dissemination of borderline protected materials. We disagree. The penalties in the instant scheme are only to be imposed after a full adversary hearing and a judicial determination on the merits. No penalty will be imposed

unless the materials are adjudicated or admitted to be obscene and the requisite scienter was present. Ohio Revised Code § 3767.06, Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1961); State v. Mazes, 7 Ohio St.2d 136, 218 N. E.2d 725 (1966); City of Cincinnati v. Marshall, 172 Ohio St. 280, 175 N.E.2d 178 (1961).

The cases cited by plaintiffs are inapposite. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Speiser v. Randall, 357 U. S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). Each of these cases involves penalties or burdens being placed by administrative bodies upon an individual exercising his First Amendment rights. The Ohio statute specifically requires an adversary hearing and a judicial determination before any speech or material may be enjoined or any penalties imposed.

We determine that plaintiffs' challenges to the constitutional validity of the Ohio Revised Code §§ 3767.01–3767.-11 are unwarranted. The Ohio nuisance statutes as applied to the suppression of allegedly obscene materials do not overreach federal constitutional guarantees.

## II

The second major thrust of the plaintiffs' arguments is that local law enforcement authorities, joined by state law enforcement authorities, have engaged in bad faith threats and harassments to suppress the exhibition of the film, "I Am Curious (Yellow)", without any likelihood of ultimate success in the courtroom. Two forms of unconstitutional bad faith harassment of the plaintiffs were offered into evidence: (1) the letters threatening prosecution sent by the Mayor and Mahoning County Prosecutor and (2) the passage and enforcement of the Youngstown City Ordinance.[1] There-

1. "79703 AN ORDINANCE:
 * * * * *
 SECTION 2. *Definitions*:
 "(a) A matter is 'OBSCENE' if, by contemporary community standards, and considered as a whole, its predominent appeal is to prurient interest. As a matter of state public policy, obscenity is utterly without redeeming social importance and constitutes a public nuisance which should be abated."
 * * * * *
 SECTION 3. PRESUMPTION:
 "Every person is presumed to have knowledge of the standards the exist in the community and what the jury or trier of fact may declare to be obscene."
 SECTION 4. GENERAL SALE OR DISTRIBUTION, ETC. OF OBSCENE MATTER: PENALTY
 "Every person who knowingly sends or causes to be sent, or brings or causes to be brought, into this State for sale or distribution or exhibition; or in this State either (1) prepares, publishes, prints, exhibits, distributes, or offers to distribute; or (2) has in his possession with intent to distribute or to exhibit or offer to distribute; any obscene matter is guilty of a misdemeanor."
 * * * * *
 SECTION 8. PARTICIPATION IN LEWD EXPOSURE OR SIMULATED ACTS OF SEXUAL INTER-

COURSE OR PERVERSION AS A PART OF A PLAY, ETC.
 "(a) Every person who, during the course of a play, nightclub act, motion picture, television production, or other exhibition, or mechanical reproduction of human conduct, engages in any lewd exposure or simulated act of sexual intercourse or perversion, which, if engaged in offstage or offscreen and in public would be subject to prosecution under Section 132.11 of the Youngstown Code of Ordinances, is guilty of a misdemeanor.
 (b) Every person who procures, counsels, or assists any person to engage in such conduct, or who knowingly exhibits, or procures, counsels or assists in the exhibition of a motion picture, television production or other mechanical reproduction containing such conduct is guilty of a misdemeanor."
 * * * * *
 SECTION 11. SEIZURE OF OBSCENE MATTER AUTHORIZED:
 "Every person who is authorized to arrest any interested person, for a violation of this ordinance is equally authorized to seize any obscene matter found in the possession or under the control of the person so arrested and to deliver the same to the court before whom the person so arrested is required to be taken."

fore, the plaintiffs claim they are entitled to have the state prosecutions and other harassments enjoined.

 (1) Public officials may constitutionally use the authority of their office to threaten enforcement of valid statutes, if such threats of prosecution are made in "good faith." *See*, Douglas v. City of Jeannette, 310 U.S. at 163, 63 S.Ct. 877. "I Am Curious (Yellow)" is being challenged in courts around the country on the basis of its explicit depiction of sexual episodes in a variety of manners and under a variety of conditions. Not only coitus, but fellatio, cunnilingus and suggested acts of sodomy were depicted during the course of the film tract. While we do not reach the issue of obscenity at this point, we believe that threats of prosecution based on the alleged obscenity of this film cannot be considered as "without any hope of ultimate success." Dombrowski v. Pfister, 380 U.S. at 490, 85 S.Ct. at 1123. On such facts, the good faith of the public officials' threats is beyond cavil. An honest warning that a valid law may be invoked is constitutional.

(2) Plaintiffs allege that the Youngstown City Ordinance is unconstitutional on its face. In addition, they allege that the double arrests and seizures of film made pursuant to the Ordinance are unconstitutional as applied. We agree.

 The Ordinance defines "obscene" in such a manner as to necessarily include within its proscriptions constitutionally protected materials. The Ordinance states:

"A matter is 'obscene' if, by contemporary community standards, and considered as a whole, its predominant appeal is to prurient interest. As a matter of state public policy, obscenity is utterly without redeeming social importance and constitutes a public nuisance which should be abated."

In A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), the United States Supreme Court overruled a nearly identical judicial construction of obscenity made by Massachusetts courts that a book "which appeals to prurient interest and is patently offensive" need not be shown to be "unqualifiedly worthless" in literary, artistic or scientific value to be obscene. Mr. Justice Brennan, who announced the judgment of the Court stated in his opinion:

"A book cannot be proscribed unless it is found to be *utterly* without redeeming social value. This is so even though the book is found to possess the requisite prurient appeal and to be patently offensive. Each of the three federal constitutional criteria is to be applied independently; the social value of the book can neither be weighed against nor canceled by its prurient appeal or patent offensiveness." 383 U.S. at 419, 86 S.Ct. at 978 (Emphasis added)

The Ordinance enacted by the City of Youngstown does not give independent weight to the "social importance" or "value" of a challenged work, rather it assumes that patently offensive works whose dominant appeal may be to the prurient interest are "as a matter of state public policy" obscene. Such an ordinance would proscribe and criminally punish the dissemination of matter in which significant contributions to artistic, literary, scientific or political spheres may be entwined and integrally related to patently offensive material. Jacobellis v. Ohio, 378 U.S. 184, 191-192, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1966)).

Further, the ordinance seems to intertwine into one element the two independent elements of *Memoirs* that the appeal of the dominant theme be to the prurient interest in sex and that the material is patently offensive as judged by community standards.

 In addition the Ordinance as applied to seizures of allegedly obscene materials pursuant to an arrest is unconstitutional. While police unquestionably have the right incident to an arrest to seize evidence used in the commission of

an allegedly criminal act, such rights are not unlimited in scope. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). A state's power to suppress obscene matter is limited by the procedural safeguard of an adversary hearing "focused searchingly on the question of obscenity." Marcus v. Search Warrants, etc., 367 U.S. 717, 732, 81 S. Ct. 1708, 1716, 6 L.Ed.2d 1127 (1961). A state may not issue a warrant to seize allegedly obscene materials based solely upon a verified complaint of a police officer or based upon an ex parte hearing in which the allegedly obscene material was "scrutinized" by the District Judge to whom application for a warrant was made. A Quantity of Copies of Books v. Kansas, 378 U.S. 205, 84 S. Ct. 1723, 12 L.Ed.2d 809 (1964). *See*, Lee Art Theatre, Inc. v. Virginia, 392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313 (1968). In so holding, the Court observed in *A Quantity of Copies of Books*,

> "[I]f seizure of books precedes an adversary determination of their obscenity, there is danger of abridgment of the right of the public in a free society to unobstructed circulation of nonobscene books." 378 U.S. at 213, 84 S.Ct. at 1727.

The challenged criminal ordinance permits the seizure of allegedly obscene matter pursuant to an arrest under the city ordinances. No warrant need be issued, no prior adversary judicial determination is provided for under the ordinance. Further, multiple seizures of allegedly obscene material may be made before any warrant has issued or any adversary hearing has occurred. In the instant case, arresting authorities utilized their broad authority by seizing on two separate occasions prints of the contested film, both seizures without the judicial authority of a warrant or an adversary hearing. Seizures of multiple copies of a film not yet found to be obscene and without resort to normal judicial safeguards is a harassing and unconstitutional manner of enforcing the Youngstown City Ordinance.

The Plaintiffs are entitled to a declaratory judgment on the constitutional invalidity of the City ordinances, Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), as well as an injunction to prevent bad faith or harassing application of that law. Having found the Ohio State nuisance statutes constitutional, the plaintiffs are not entitled to an injunction against the good faith threats of prosecution, or actual prosecution, under those statutes.

## III

We turn to the issue of obscenity. We are reluctant to consider this issue in that there are state actions pending whose resolution in whole, or in part, may depend upon a determination as to the obscenity of the film, "I Am Curious (Yellow)". None of these actions, however, were pending at the time federal jurisdiction was initially invoked in this action on September 16, 1969. Also, the present case joins as a party Grove Press, Inc., national distributor of "I Am Curious." The actual controversy between the defendants and Grove Press, Inc., as to whether this film is to be shown without harassment by certain state and city officials is not being contested in any state action and is sufficient to invoke jurisdiction under the Declaratory Judgment Act. 28 U.S.C. § 2201. "We have not the right to decline the exercise of * * * jurisdiction simply because the rights asserted may be adjudicated in some other forum." Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 395 (1967).

As to whether the film, "I Am Curious (Yellow)" is constitutionally protected matter or is obscene and may be regulated by statute, we are guided by a surfeit of Supreme Court standards. The prevailing standard is an "elaboration" of the test for determining obscenity established in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). That "prevailing standard" was expressed in A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts in

which Mr. Justice Brennan announced the judgment of the Court but the Court members were unable to join in an "Opinion of the Court." Three separate factors must coalesce independently:

"(a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." 383 U.S. at 418, 86 S.Ct. at 977.

This prevailing standard is modified substantially by the dicta which follows it,

"On the premise, which we have no occasion to assess, that *Memoirs* has the requisite prurient appeal and is patently offensive, but has only a minimum of social value, the circumstances of production, sale, and publicity are relevant in determining whether or not the publication or distribution of the book is constitutionally protected. Evidence that the book was commercially exploited for the sake of prurient appeal, to the exclusion of all other values, might justify the conclusion that the book was utterly without redeeming social importance. It is not that in such a setting the social value test is relaxed so as to dispense with the requirement that a book be *utterly* devoid of social value, but rather that, as we elaborate in Ginzburg v. United States, 383 U.S. 463, pp. 470–473, 86 S.Ct. 969, [16 L.Ed.2d 31,] where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, a court could accept his evaluation at its face value." 383 U.S. at 420, 86 S.Ct. at 978.

This dicta was transformed into the "Opinion of the Court" in Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 969, 16 L.Ed.2d 31 (1966). In *Ginzburg,* the scope of evidence which the Court considers in obscenity cases was expand-ed beyond the face of the materials themselves;

"In the case in which this Court has decided obscenity questions since *Roth,* it has regarded the materials as sufficient in themselves for the determination of the question. In the present case, however, the prosecution charged the offense in the context of the circumstances of production, sale, and publicity and assumed that, standing alone, the publications themselves might not be obscene. We agree that the question of obscenity may include consideration of the setting in which the publications were presented as an aid to determining the question of obscenity, and assume without deciding that the prosecution could not have succeeded otherwise." 383 U.S. at 465, 86 S.Ct. at 944.

*Ginzburg* went on to note that the expressed intention of the purveyor of materials to emphasize in graphic or sensual detail "an appeal to sexual curiosity" may damn an otherwise permissible work:

"Like the other publications, its pervasive treatment of sex and sexual matters rendered it available to exploitation by those who would make a business of pandering to 'the widespread weakness for titillation by pornography.' Petitioners' own expert agreed, correctly we think, that '[i]f the object [of a work] is material gain for the creator through an appeal to the sexual curiosity and appetite,' the work is pornographic. In other words, by animating sensual detail to give the publication a salacious cast, petitioners reinforced what is conceded by the Government to be an otherwise debatable conclusion." 383 U.S. at 471, 86 S.Ct. at 947.

In its concluding passage, the *Ginzburg* decision was analogized to the concurrence of the Chief Justice Warren in *Roth*

"Nor should [upholding the obscenity convictions] inhibit the enterprise of others seeking through serious endeavor to advance human knowledge or un-

derstanding in science, literature or art. All that will have been determined is that questionable publications are obscene in a context which brands them as obscene as that term is defined in *Roth* a use inconsistent with any claim to the shelter of the First Amendment. 'The nature of the materials is, of course, relevant as an attribute of the defendant's conduct, but the materials are thus placed in context from which they draw color and character. A wholly different result might be reached in a different setting.' Roth v. United States, 354 U.S., at 495, 77 S.Ct. 1304 (Warren, C. J., concurring).

"It is important to stress that this analysis simply elaborates the test by which the obscenity vel non of the material must be judged. Where an exploitation of interests in titillation by pornography is shown with respect to material lending itself to such exploitation through pervasive treatment or description of sexual matters, such evidence may support the determination that the material is obscene even though in other contexts the material would escape such condemnation." 383 U.S. at 475, 86 S.Ct. at 949.

Subsequent to *Ginzburg*, the United States Supreme Court has focused on such factors as the character of the audience likely, or permitted, to view a film and the method in which the film was purveyed to the public in determining whether material is protected or obscene. Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968); Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

In Ginsberg v. New York, the United States Supreme Court held that a legislature may reasonably conclude that "the ethical and moral development of * * youth" requires "in the sale of pornography to children special standards, broader than those embodied in legislation aimed at controlling dissemination of such materials to adults." People v. Kahan, 15 N.Y.2d 311, 258 N.Y.S.2d 391, 206 N.E.2d 333 (1965). 390 U.S. at 640–641, 88 S.Ct. at 1281.

And in Stanley v. Georgia, the United States Supreme Court once again focused its attention on the audience which perceives the allegedly obscene materials and in overturning a criminal conviction based on mere private possession of allegedly obscene matter held,

"[T]he state may no more prohibit mere possession of obscene matter on the ground that it may lead to antisocial conduct than it may prohibit possession of chemistry books on the ground that they may lead to the manufacture of homemade spirits.

It is true that in *Roth* this Court rejected the necessity of proving that exposure to obscene material would create a clear and present danger of antisocial conduct or would probably induce its recipients to such conduct. 354 U.S. at 486–487, 77 S.Ct. 1304. But that case dealt with public distribution of obscene material and such distribution is subject to different objections. For example, there is always the danger that obscene material might fall into the hands of children."

Perhaps the most compelling differences between "mere private possession" of obscene matter and "public exhibition" of it are in the audiences which will view the film. A public exhibition gathers together large numbers of persons, hence intensifying and stimulating one's emotional—rather than contemplative—responses. Further, the audience is likely to be composed of those who have been stimulated or induced to attend as a result of media communication or "word of mouth" advertising. Thus, the audience which views a movie in a public exhibition sees that movie with a certain set of prestimulated or induced conceptions. It is when the purveyor of the allegedly obscene material seeks to induce such expectations of erotic tension in the mind of the consumer, that the United States Supreme Court has said a state may look beyond otherwise debatable or unobjectionable materials and prohibit their distribution and exhibition because they

are purveyed in a "pandering" or "titillating manner."

We have viewed the film, "I Am Curious (Yellow)" in its entirety. We have heard the testimony of expert witnesses for the Plaintiffs and viewed their exhibits. Upon a review of all of the evidence, we believe, in view of its widespread publicity as "pull[ing] down * * * the outermost sex barrier"[2] in the depiction of sexual activity and certain other associated factors, the public exhibition of the film, "I Am Curious (Yellow)" may be curbed as obscene material, unprotected by the First Amendment.

The film tract, "I Am Curious (Yellow)" depicts the curious searchings of a young woman attempting to personally relate her existence to the political, social and sexual currents of Swedish democracy. In relating to the complex of real and imagined forces which composed her life in a democracy, the heroine of the film engaged in numerous normal and abnormal sexual episodes, each of which was graphically portrayed to the viewer.

Our heroine's search for equality of women's rights in a democracy was ironically portrayed by her helpless submission to the advances of a young man who had "loaned" her father $90 to gain entrance to her home. Thereafter, the director chose to express his contempt for established institutions by having his lead actors engage in coitus on the balastrade of the National Palace in front of a guard as the Swedish national anthem played, and then to acrobatically engage in coitus in the oldest tree in Europe while a religious ceremony was portrayed in the background. Subsequent acts of coitus, fellatio, cunnilingus and suggested acts of sodomy were depicted between the couple, including some rather violent moments at a "religious" retreat, and an array of explicit sexual acts in a variety of settings after our heroine realized how tragically self-defeating her relationship was with her lover, as well as how incongruous were her political and sexual philosophies.

We are bound, however, by the prevailing United States Supreme Court standards on the definition of what is protected matter. That standard requires the independent coalescing of three elements:

(a) the material is patently offensive because it affronts community standards relating to the description of representation of sexual matters; and

(b) the dominant theme of the material taken as a whole appeals to a prurient interest in sex;

(c) the material is utterly without redeeming social value.

We hold each of these factors to be present in the instant case.

(a) the expert witnesses called by Plaintiffs who testified as to "community standards" conceded that certain of the explicit sexual depictions referred to above were a "new departure" from and constituted the "outer limit today in the depiction of sexual activity" judged by typical community standards. We find that explicit depiction of preparation for and engagement in coitus, fellatio, cunnilingus and suggested acts of sodomy are "patently offensive" when shown in the exhibition of a film open to the general public over 18 years of age.

(b) The publicity attendant to the general exhibition of this movie has magnified the importance of sexual themes in the film as a whole. This is so even though the exhibitor and distributor of the film have contracted to prevent advertising in a pandering manner the graphic content of this film and to limit admittance to those over 18 years of age. One expert frankly admitted that the drawing card of this film is its sexual depictions. Thus, the audiences which view the film are coming together in a public place with the joint expectation of being titillated by pornography and of being patently offended by depictions

2. Vilgot Sjomen, I Am Curious (Yellow), Grove Press, New York 1968.

which go beyond anything ever shown in a film for general release.

Not only is the audience likely to magnify the importance and appeal of the sexual themes of the film, but also the context of its production indicates that a sexual theme was to be pervasively and graphically impressed upon the viewer of the film. In that the director of "I Am Curious (Yellow)" is an exponent of cinema verite with certain surrealistic impulses, several of the experts, including the curator of contemporary art of the Cleveland Museum of Art, believed that explicit and shockingly graphic sexual episodes are very much in fitting with his artistic competence and style. The film, however, was to be shown for general audiences not to museum curators, professors of the cinema and sophisticated reviewers of the cinema verite.

The characterizations of the leading actors direct and heightening the sexual theme and appeal of the film. As Dr. C. A. DeLeon, a practicing psychiatrist and professor at Case Western Reserve observed, this film is in large part a study of a severely disturbed person whose aberrant sexual behavior was symptomatic of her general sicknesses. We believe that exposing a general audience by explicit portrayal to twelve to twenty minutes of the sexual activities of two concededly abnormal persons engaging in prurient behavior is so shockingly offensive that these sexual themes may be said to be the dominant theme of the film, taken as a whole.

Also, we are not unmindful of the fact that the use of camera and cinematic techniques heighten the sensory impact of the sexual themes in the film. The audience was constantly reminded that the tract they were seeing was a film within a film, and that the sexual relationship and tension of the director to his heroine was a prevalent sub-theme of the film. Similarly, close up focusing of the camera was constantly used to reinforce innuendoes of the actors, particularly in their sexual suggestions.

Thus we conclude that the publicity of the film, its production technique, the reputation of its director, the content of its subject matter and its cinemagraphic techniques create a dominant theme which appeals to the prurient interest, taking the movie as a whole

(c) Similarly, even if the sexual scenes have some tangential relationship to the political and social themes expressed in the picture, the graphic and unrelenting repetition of sexual suggestion and activity can not fail to shock and impose upon the sensibilities of the viewer of the film. Many, perhaps most persons, who see this movie attend the movie in the expectation of seeing such sexual episodes. Such expectations create a psychology of titillation in the viewers causing them to fail to perceive whatever social value the movie may purport to convey.[2] We hold that the film, "I Am Curious (Yellow)" is utterly without redeeming social value.

Apart from our finding this film tract is obscene under the three-fold standard of Memoirs, we believe that the challenged film is so patently offensive in character as to desensitize the community's standards of moral and ethical values. This Court does not subscribe to the theory that utterly obscene materials when incorporated into a patriotic or historical episode gain First Amendment protection any more than attaching a scene of George Washington at Valley Forge to a wholly pornographic film would transfigure it into an historical

2. As the United States Supreme Court has held, "[B]y animating sensual details to give the publication a salacious cast, petitioners reinforced what is conceded by the Government to be an otherwise debatable conclusion." Ginzberg v. United States, 383 U.S. at 471, 86 S.Ct. at 948. And in *Memoirs*, the Court observed that,

"It is not that in such a setting the social value test is relaxed so as to dispense with the requirement that a book be utterly devoid of social value," but that a court may accept the purveyor's sole emphasis at its face value. 383 U.S. at 420, 86 S.Ct. at 978.

documentary. One can tie a blue ribbon around a film tract which is 'hard core' pornography, but it is still pornography. Proof of the obscenity of this film is in the seeing.

By the testimony of the plaintiffs' own experts, this film, which contains from twelve to twenty minutes of totally explicit sexual scenes, goes further than any other in the depiction of sex. To this we can only state that it has reached the ultimate in the portrayal of normal and abnormal sexual relations. The film removes the soul from man, and reduces him to animal status.

If, considering its prurient appeal, this film can be said to conform to the contemporary standards of the community, then this Country should take a hard look at itself, for this Republic will not long endure if it continues to undermine the moral worth of its citizens.

We hold that the Ohio nuisance statutes, Ohio Revised Code §§ 3767.01–3767.11, are constitutional on their face and as applied to the regulation of allegedly obscene materials, and that the Youngstown City Ordinance is unconstitutional on its face and as applied to the regulation of the exhibition and confiscation of allegedly obscene materials. We further find that the film, "I Am Curious (Yellow)" is obscene and is not constitutionally protected matter.

BATTISTI, Chief Judge (concurring).

I concur in the majority's conclusions, but wish to state my views with regard to the obscenity question.

The movie industry, as well as other forms of communication, is not only a medium of artistic and other expression for particular individuals; but it comprises, in fact, a powerful, pervasive and persuasive educative institution within our society. It must bear responsibility commensurate with its power. This film, purporting to be both artistic and educative, explicitly depicts, or creates the illusion of explicitly depicting, acts of coitus, the commencement of cunnilingus, the ending of fellatio, and an act which may be interpreted by some as sodomy and by others as coitus from the posterior position.

First Amendment privileges are not absolutes. Inherently, the exercise or use of a First Amendment privilege or right bears the correlative responsibility to consider the effect of such use on others. Thus, as the right to own private property does not confer upon anyone the right to pollute the atmosphere or to poison the village wells, the First Amendment does not confer upon anyone the right to pollute or to shock the sensibilities of reasonable society.

The director and the producer of "I am Curious (Yellow)," as the testimony reflects, were familiar with the standards to be met for enjoyment of constitutional protection in the United States. To evade the "prurient appeal" and "redeeming social value" aspects of those standards, as set forth by the Supreme Court of the United States, specific sex acts were depicted in such fashion as to make a social statement by means of the sexual act. The acts of coitus were surrounded by cinema techniques designed to indicate political protest (the ballistrade episode), and derision of established social institutions or norms (the oldest tree episode), also sexual activity was incorporated into seemingly humorous and unrealistic circumstances (the retreat house and water pond episodes).

These indirect and totally transparent attempts to avoid the consequences of what is otherwise utterly devoid of any redeeming social value ought not to be afforded constitutional protection.

The cunnilingus and fellatio scene has no justification whatever on any rational standards. This scene was designed to reflect a moment of "tenderness" (as one expert puts it) within the couple's sordid love affair. It is entirely pornographic in nature, prurient in appeal, and shocks the sensibilities of reasonable minds.

Pornography can never meet the First Amendment standards formulated by the Supreme Court of the United States. It is not considered artistic, it contains no

redeeming social value, and is prurient in appeal. As we do not hesitate to pierce a corporate veil in order to deal fairly with official corruption indirectly conceived and carried out, so we should not hesitate to pierce an attempt to raise pornography to the level of constitutional protection where the explicit depictions of coitus, otherwise hard-core pornography, are veiled in humorous political significance, protests against present-day social norms, and feigned considerations of that "tenderness" which always exist in a genuine love affair. When the real motives or objectives of this film are discerned, it must be condemned.

Civilized society can only exist within a framework of reasonable inhibition. When reasonable inhibition regresses, the disintegration of civilized society commences; and this film, if allowed in general circulation to so-called adult audiences, will constitute a landmark in this connection.