**SPOKANE ARCADES, INC., a Washington Corporation, Plaintiff,**

v.

**The Honorable Dixie Lee RAY, as Governor of the State of Washington in her representative capacity only, the Honorable Bruce K. Chapman, Secretary of State of Washington in his representative capacity only, the Honorable Slade Gorton, as Attorney General of the State of Washington in his representative capacity only, and Donald C. Brockett, Spokane County Prosecuting Attorney in his representative capacity only, Defendants.**

**No. C 77–353.**

United States District Court,
E. D. Washington.

Feb. 6, 1978.

Leland T. Johnson, Jr., Asst. Atty. Gen., Slade Gorton, Atty. Gen., Olympia, Wash., Donald C. Brockett, Spokane County Pros. Atty., Spokane, Wash., for defendants.

## OPINION

FITZGERALD, District Judge.

The State of Washington, by initiative,[1] has adopted a broad and comprehensive law dealing with obscenity.

Under Initiative 335, certain places are declared to be "moral nuisances" and, as such, injurious to public morals. Section 2 of the initiative lists the types of places which constitute a moral nuisance. Among the establishments listed are theatres which exhibit "lewd films" and book stores which deal in "lewd publications."

Employing the procedures of Initiative 335, the attorney general, county or city prosecutors, or any private citizen may bring an equitable action to abate the alleged moral nuisance by filing a verified complaint. After the filing of the complaint with a request for a temporary injunction, the judge is required to grant a hearing within ten days. Upon application (but before any judicial determination of obscenity) the court can issue an *ex parte* order prohibiting anyone from removing the contents of the establishment pending the hearing on a motion for a temporary injunction. And even if the order banning removal should not extend to all goods in the establishment, the proprietor may be required to keep a full accounting of all business transactions. Summary contempt punishment is allowed for violations of any injunctions issued under Initiative 335.

If on hearing for a temporary injunction it should be determined that a temporary injunction will issue and if the person controlling the alleged nuisance was given three days notice for the hearing, the issuing court may declare a temporary forfeiture of the real property involved until a final decision is made on a permanent in-

Robert Eugene Smith, Atlanta, Ga., Jack R. Burns, Hubbard & Burns, P. S., Kirkland, Wash., for plaintiff.

---

1. Initiative Measure No. 335 (Approved November 8, 1977); 1913 c. 127, RRS § 946; RCW c. 7.48.

junction. After a final determination that a place is a moral nuisance, the judicially declared lewd matter is to be destroyed, funds received for the sale of such lewd matter is forfeited to the local government, and the real property where the nuisance was located may be closed to any purpose for up to one year.

The plaintiffs operate movie houses and book stores where sexually oriented materials are exhibited or sold to the public. They have brought this case in federal court claiming violations of federal constitutional rights and demand injunctive and declaratory relief. The central issue is whether Initiative 335 is constitutionally valid.

### JURISDICTION

The plaintiffs' amended complaint claims violations of the United States Constitution, principally of the First Amendment and the Due Process provision of the Fourteenth Amendment and additional violations of the Fourth, Fifth and Sixth Amendments.

This court has jurisdiction under the provisions of 28 U.S.C. § 1343(3).

### STANDING

■ The plaintiffs operate a number of movie houses and book stores located in various cities in the State of Washington. There can be little doubt that the authors and supporters of Initiative 335 intended to provide an effective and comprehensive means of controlling obscenity in Washington. It is to be expected that the state attorney general and the county prosecutors of Washington will faithfully and energetically perform their duties under the law. Should they fail to do so, private persons are authorized by the initiative to maintain an action.

The plaintiffs' movie houses and book stores offer sexually oriented materials to the public which they contend are protected under the First Amendment of the United States Constitution. Threat of prosecutions is very real to the plaintiffs, and the consequences will be substantial. The initiative, by its terms, permits forfeiture of all money collected by admissions or sale, forfeiture of contents and fixtures of the place where any obscene materials are found, an order closing the place to any use for as long as a year, forfeiture of any lease on the premises, and an injunction perpetually enjoining the defendants from maintaining a nuisance anywhere.

■ Normally, the mere possibility of erroneous initial application of constitutional standards by a state will not justify the enjoining of state statutory procedures. But statutes regulating expression must be narrowly drawn to avoid the jeopardizing of First Amendment rights. *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

> It has long been recognized that the First Amendment needs breathing space and that statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society. [citations omitted] As a corollary, the Court has altered its traditional rules of standing to permit—in the First Amendments area—'attacks on overlybroad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' *Dombrowski v. Pfister. Broadrick v. Oklahoma*, 413 U.S. 601, 611–12, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973).

Nor does *Broadrick v. Oklahoma* undercut *Dombrowski*, as the defendants contend. In *Broadrick*, the Court reviewed an Oklahoma law which prohibited certain political activity by state employees. The Court explicitly adopted the broad standing requirement of *Dombrowski*, at least as it pertains to speech or expression:

> Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or as-

sumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.

*Broadrick v. Oklahoma,* at 612, 93 S.Ct. at 2916.

But the Court in *Broadrick* did qualify its broad standing requirements, noting that where conduct and not speech is regulated, statutory overbreadth must be not only real but substantial.

It is plain that Initiative 335 is broadly drawn and purposely drafted to cast a broad net effectively prohibiting and deterring the dissemination of obscene material. The initiative exposes anyone who undertakes public exhibition or sale of sexually oriented material to the risk of losing not only condemned material but the proceeds of the business, and the place where the business is conducted if the material is later determined to be obscene. Beyond this, once proceedings have been filed, the court may enjoin disposition of the contents and materials which are in any way connected with maintaining a nuisance as defined under the law. The officer serving the restraining order is to inventory the contents and materials which appear to him to be connected with a nuisance. The owner may also be required to account for all transactions involving the stock in trade.[2]

The punitive provision of the initiative would in all probability cause any reasonable person to avoid the risk of public exhibition or sale of any materials in which there was any real chance of an ultimate judicial determination of obscenity.

I, therefore, conclude that Initiative 335 is overbroad and that the plaintiffs have standing in this case to attack the initiative on First and Fourteenth Amendment grounds.

*THE ABSTENTION DOCTRINE*

■ The defendants argue that the doctrine of abstention should be applied in this case. This issue was first considered by United States District Judge Marshall Neill

when he heard the plaintiffs' motion for a restraining order. Judge Neill concluded that abstention was inappropriate. I agree.

The defendants misconceive the policy reasons supporting the abstention doctrine. Once jurisdiction is established, a district court is under a heavy responsibility to go forward with the matter before it. The Supreme Court has noted:

The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest.

*County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–189, [79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163] (1959).

The abstention doctrine was recently considered by the Supreme Court in the case of *Ohio Bureau of Employment Service v. Hodory,* 431 U.S. 471, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977). The Court reviewed the two principal bases underlying the doctrine:

There are, of course, two primary types of federal abstention. The first, usually referred to as *Pullman* abstention, involves an inquiry focused on the possibility that the state courts may interpret a challenged state statute so as to eliminate, or at least to alter materially, the constitutional question presented. *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, [61 S.Ct. 643, 85 L.Ed. 971] (1941). See *Bellotti v. Baird,* 428 U.S. 132, [96 S.Ct. 2857, 49 L.Ed.2d 844] (1976). The second type is *Younger* abstention, in which the court is primarily concerned in an equitable setting, with considerations of comity and federalism, both as they relate to the State's interest in pursuing an on-going state proceeding, and as they

---

**2.** R.C.W. 7.48.062.

involve the ability of the state courts to consider federal constitutional claims in that context. *Younger v. Harris*, 401 U.S. 37, [91 S.Ct. 746, 27 L.Ed.2d 669] (1971). See *Huffman v. Pursue, Ltd.*, 420 U.S. 592, [95 S.Ct. 1200, 43 L.Ed.2d 482] (1975); *Juidice v. Vail*, 430 U.S. 327, [97 S.Ct. 1211, 51 L.Ed.2d 376] (1977); *Trainor v. Hernandez*, 431 U.S. 434, [97 S.Ct. 1911, 52 L.Ed.2d 486] (1977), *id.*, at 448 (concurring opinion).

*Hodory*, 431 U.S. at 477, 97 S.Ct. at 1902, 52 L.Ed.2d at 520.

The arguments made for abstention rejected in *Hodory* were much like those made by the defendants here. In sum, the defendants contend that since the plaintiffs are free to pursue their remedies in state court, principles of comity require abstention. But the defendants' counsel acknowledged during argument that no state judicial proceedings involving Initiative 335 are before Washington courts, and since no state judicial proceedings are to be disrupted by this proceeding, I conclude that *Younger* abstention is not appropriate.

The defendants rely also on *Pullman* abstention. *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Under *Pullman*, abstention is proper if a state court might construe state law in a manner which removes federal constitutional implications. In support of their argument for *Pullman* abstention, the defendants point to *Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976). But that case is inapplicable. The Court in *Bellotti* concluded that an interpretation by the Massachusetts Supreme Judicial Court might narrow or remove the federal questions presented and suggested that the district court should have certified the question under Massachusetts' procedure directly to the Supreme Judicial Court for its construction. Certification procedure is provided for under the Revised Code of Washington, 2.60.010–2.60.900, but the interpretation given to that statute by the

Supreme Court of Washington precludes certifications in the present case.[3]

The procedures of Initiative 335 dealing with obscenity are neither obscure nor ambiguous, and statutory construction to ascertain their meaning is not required. What is in issue is not the meaning of the statute but whether procedures under the statute meet constitutional requirements. Since these questions ultimately involve federal issues, certification is not warranted and *Pullman* abstention is not appropriate.

## THE APPLICABILITY OF HICKS v. MIRANDA

The principal thrust of the defendants' argument on the constitutional issues is that statutory procedures similar to those here in question have been previously upheld by the United States Supreme Court; further, since district courts are bound to follow decisions of the Supreme Court under the rule of *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), the constitutional issues before this court are foreclosed from present consideration.

I do not quarrel with the rule that district courts should follow the decisions of the Supreme Court and not relitigate issues of law decided by that Court. The question is whether defendants are correct in their contentions that procedures similar to those provided in Initiative 335 have been previously upheld in the Supreme Court.

The defendants rely on *Grove Press, Inc., et al. v. Flask, et al.*, 326 F.Supp. 574 (N.D. Ohio 1970). In that case a three-judge court found the film "I Am Curious Yellow" to be obscene. Comparison of the Ohio law with Initiative 335 reveals that the procedures are in many ways similar. The district court concluded that the provisions of Ohio law that permitted an *ex parte* restraining order preventing the defendant or any person from interfering with the personal property and contents of an alleged nuisance was not constitutionally impermissible. But that issue was not

---

**3.** "Nor would this court take jurisdiction of a certified question which involves ultimately a federal constitutional issue, for again this

would not meet the criteria of the certification statute." *In re Elliott*, Wash., 446 P.2d 347, 358 (1968).

squarely before the court since a restraining order had been denied in state court and prior restraint was not involved. Moreover, unlike Initiative 335, the Ohio law did not permit the stock in trade to be inventoried or require a full accounting of all business transactions.

Commendably, the defendants point out that the judgment of the three-judge court in *Grove Press, supra,* was vacated and the case remanded after appeal to the United States Supreme Court.[4] Thus, the Supreme Court did not pass upon the constitutionality of the Ohio procedures in *Grove Press, supra.*

The second case relied upon by the defendants is *Ewing v. Without A Stitch,* 37 Ohio St.2d 95, 307 N.E.2d 911 (1974). In that case the Supreme Court of Ohio granted a motion of certification allowing an appeal to consider only four issues:

(1) The applicability of R.C. 3747.01 et seq. to a theater in cases involving the exhibition of a single obscene motion picture film; (2) the constitutionality of R.C. 3767.01 et seq. prescribing a method of controlling obscenity; (3) the mandatory or discretionary nature of the remedies set forth in R.C. 3767.01 et seq.; and (4) the availability of the nonstatutory remedy of forfeiture of box office receipts derived from the exhibition of a film after it was judicially determined to be obscene.

In its decision, the court observed that Ohio law does not permit censorship in any form prior to a judicial determination of obscenity. But the holding also undercuts the defendants' position in the present case in one other respect. The Ohio Supreme Court concluded that penalties may not be imposed under Ohio obscenity laws unless the person penalized has knowledge of the offending material's contents.[5]

Following the decision of the Supreme Court of Ohio, *Ewing v. Without A Stitch,* an appeal was taken to the United States Supreme Court. There the appeal was dismissed for want of substantial federal question. *Art Theatre Guild, Inc. v. Ewing,* 421 U.S. 923, 95 S.Ct. 1649, 44 L.Ed.2d 82 (1975). The summary dismissal of the appeal by the Supreme Court is understandable since no constitutional issue was presented. The film in question, "Without A Stitch," had been judicially determined to be obscene and under the principle of *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1954) was not entitled to constitutional protection. Thus, the constitutionality of Initiative 335 is not foreclosed by prior authoritative decisions of the United States Supreme Court.

## THE CONSTITUTIONAL ISSUES

The purpose of Initiative 335 is to control public exhibition and sale of obscene materials.[6] Passage of the initiative is

---

**4.** . . . Judgment vacated and case remanded for further consideration in light of *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419; *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446; *Kaplan v. California,* 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492; *United States v. 12 200-ft. Reels Film,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500; *United States v. Orito,* 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513; *Heller v. New York,* 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745; *Roaden v. Kenucky,* 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757. MR. JUSTICE BRENNAN, joined by MR. JUSTICE STEWART and MR. JUSTICE MARSHALL, would vacate the judgment and remand case for further proceedings not inconsistent with his dissent in *Paris Adult Theatre I v. Slaton,* 413 U.S. 73, 93 S.Ct. 2628. See *Miller v. California,* 413 U.S. 47, 93 S.Ct. 2607 . . .

*Grove Press, Inc., et al. v. Flask, et al.,* 413 U.S. 902, 93 S.Ct. 3026, 37 L.Ed.2d 1013 (1973).

**5.** The Ohio court noted *Smith v. California,* 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) where the Supreme Court struck down an ordinance imposing criminal penalties on a book store owner for mere possession of a book later determined to be obscene even though the owner was without knowledge of the contents of the book. The Supreme Court reasoned that to impose criminal liability in such circumstances would force book store owners to restrict the books they sell to those they had inspected which would result in restricting the distribution of constitutionally protected, as well as obscene, books.

**6.** "Obscene" refers to that which is repugnant or disgusting to the senses, or offensive, filthy, foul, repulsive, or loathsome. Except as used

clear proof that a voting majority of the State of Washington is opposed to public dissemination of obscene films or printed matter. The critical issue is whether the procedures selected to accomplish the evident purpose of the law meets federal constitutional requirements.

■ As a general rule, it is presumed that expression is protected under the First Amendment until a final judicial determination of obscenity is made.[7] But as may be seen, the boundaries delineating obscene material from the non-obscene are murky and ill-defined.

The first significant attempt by the United States Supreme Court to define the legal meaning of obscenity occurred in *Roth v. United States*. Justice Brennan, writing for the Court, determined that obscene material is not entitled to constitutional protection. Once a final judicial determination is made that material is obscene, neither First Amendment nor other constitutional rights are implicated. Under such circumstances, the State is not required to establish either compelling necessity or rational basis to destroy the pernicious material.

The principle that obscene material is beyond the scope of constitutional protections presupposes a definition of obscenity so that the boundary may be drawn between what is protected expression and what is not. The Supreme Court undertook in *Roth* to provide such a definition, recognizing at the outset that sex and obscenity are not synonymous. Material is said to be obscene if to the average person, applying contemporary community standards, the dominant theme of the material, taken as a whole, appeals to prurient interest. This formulation was later augmented in *Memoirs v. Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966). Finally, in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), Chief Justice Burger, writing for the Court, restated the definition of obscenity as follows:

(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest; [citations omitted] (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

*Miller, supra*, at 24, 93 S.Ct. at 2615.

On the same day as *Miller*, the Supreme Court also decided *Paris Adult Theatre v. Slaton*, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). Interestingly, in *Paris Theatre* Justice Brennan, the articulator of the *Roth* definition of obscenity, now dissented. He was convinced on the basis of 16 years of experience following *Roth*,[8] that no acceptable definition of obscenity could be devised which would strike an acceptable balance between the individual's constitutional rights on the one hand and the State's interest in regulating dissemination of sexually oriented material on the other.[9]

---

in the law, it does not necessarily have any sexual connotations. "Pornography," on the other hand, derived from the Greek words for harlot and writing, is limited to depictions of sexual lewdness or erotic behavior. Definitionally, obscenity may or may not be pornographic, and pornography may or may not be obscene.
Professor Frederick F. Schauer, *The Law of Obscenity*, (1976) p. 1.

7. *U. S. v. Tupler*, 564 F.2d 1294 (9th Cir. 1977). *See also*, Professor Schauer, *The Law of Obscenity*, (1976) p. 229.

8. Justice Stewart, concurring in *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964), recognized the difficulty in attempting to define obscenity. He said in part: ". . . perhaps I could never succeed in intelligibly doing so. But I know it when I see it, and the motion picture involved in this case is not that."

9. "[N]o one definition, no matter how precisely or narrowly drawn, can possibly suffice for all situations, or carve out fully suppressible expression from all media without also creating a substantial risk of encroachment upon the guarantees of the Due Process Clause and the First Amendment."
*Paris Adult Theatre, supra*, 413 U.S., at 85, 93 S.Ct., at 2648.

In Initiative 335 the word "lewd" is generally substituted for the term "obscene", and the definition of lewd generally follows the definition of obscenity set out in *Miller*.[10] The defendants suggest that since the terms "obscene or lewd" in Initiative 335 comport with the obscenity definition in *Miller*, the initiative cannot be found vague or overbroad. But the problem of regulating obscenity is in large part due to difficulty of definition. Freedom of expression involves sensitive and important constitutional rights. For these reasons the Supreme Court has consistently required that under the First Amendment efforts to regulate or prohibit obscenity be surrounded by procedural safeguards which

> . . . ensure against the curtailment of constitutionally protected expression, which is often separated from obscenity only by a dim and uncertain line . . . Our insistence that regulations of obscenity scrupulously embody the most vigorous procedural safeguards . . . is . . . but a special instance of the larger principle that the freedoms of expression must be ringed about with adequate bulwarks . . .

*Bantam Books v. Sullivan*, 372 U.S. 58, 66, 83 S.Ct. 631, 637, 9 L.Ed.2d 584 (1963).

Close examination of Initiative 335 inevitably leads to the conclusion that the initiative undertakes to regulate obscenity in a broad and comprehensive manner. The impact of the law is directed not only at the offending material but at the place where such material may be found and at any entity or person connected with it.[11] The initiative applies to films, video tapes, photographs, books, magazines, pamphlets, illustrations, sound recordings and many other forms of expression.[12] It permits the attorney general or any prosecuting attorney or a citizen to initiate proceedings in

the name of the State of Washington to abate as a nuisance obscene films or other material and to close every place where obscene films or material may be publicly exhibited or sold or held for those purposes.[13]

At the time proceedings are initiated under the initiative, the complainant is entitled to apply for a preliminary injunction, in which event the court must order a hearing within ten (10) days.[14] Immediately upon a complainant's filing of the proceedings, the judge is on good cause authorized to issue a restraining order enjoining the defendant and all other persons from removing or interfering with the contents and the personal property of the place where the nuisance is said to exist, excepting only stock in trade. The court may require an accounting of all business transactions taking place on the premises. The officer serving the restraining order is required to make and return to the court an inventory of the contents and personal property located and used in maintaining or conducting the nuisance.[15] A defendant must be given three (3) days notice prior to the hearing of the preliminary injunction and the court may order trial of the case expedited to the time set for the first hearing.[16]

If a preliminary injunction is granted, the court may declare temporary forfeiture on the use of the premises and issue an order closing the place for all uses until final decision is rendered.[17] An admission or finding of guilt of any person under laws dealing with obscenity or prostitution is admissible to prove existence of the nuisance and as prima facie evidence of nuisance and of knowledge and acquiescence and participation therein on the part of the person charged with maintaining the nuisance.[18] If existence of a nuisance is established at trial, the court shall enter judgment perpet-

10. R.C.W. 7.48.050.

11. R.C.W. 7.48.052.

12. R.C.W. 7.48.050.

13. R.C.W. 7.48.058.

14. R.C.W. 7.48.060.

15. R.C.W. 7.48.062.

16. R.C.W. 7.48.064.

17. R.C.W. 7.48.066.

18. R.C.W. 7.48.072.

ually enjoining the defendant and any other person from further maintaining the nuisance complained of and enjoining the defendant from ever maintaining a nuisance anywhere.[19] Violations of the restraining order constitute contempts of court which may be summarily punished.[20]

The Supreme Court in *Marcus v. Search Warrant*, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961) considered Missouri procedures somewhat similar to those outlined in Initiative 335. In that case under Missouri law, police officers were permitted to file a sworn accusation in court alleging possession of obscene publications for sale. On the basis of the accusation, the court in an *ex parte* proceedings could issue a warrant requiring seizure of the offending material. The court in which the matter was pending was required promptly to set a time for hearing.

The Supreme Court held that the Missouri procedures failed to provide due process sufficient to safeguard constitutionally protected expression under the First and Fourteenth Amendments. The Court noted that the holding in *Roth* recognized no state power to restrict the dissemination of books which are not obscene:

The question here is whether the use by Missouri in this case of the search and seizure power to suppress obscene publications involved abuses inimical to protected expression. We held in *Roth v. United States*, 354 U.S. 476, 485, [77 S.Ct. 1304, 1 L.Ed.2d 1498,] that 'obscenity is not within the area of constitutionally protected speech or press.' But in *Roth* itself we expressly recognized the complexity of the test of obscenity fashioned in that case and the vital necessity in its application of safeguards to prevent denial of 'the protection of freedom of speech and press for material which does not treat sex in a manner appealing to prurient interest.' *Id.*, p. 488, 77 S.Ct. 1304. We have since held that a State's power to suppress obscenity is limited by the constitutional protections for free expres-

sion. In *Smith v. California*, 361 U.S. 147, 155, [80 S.Ct. 215, 4 L.Ed.2d 205] we said, 'The existence of the State's power to prevent the distribution of obscene material does not mean that there can be no constitutional barrier to any form of practical exercise of that power,' inasmuch as 'our holding in *Roth* does not recognize any state power to restrict the dissemination of books which are not obscene.' . . . For the use of these warrants implicates questions whether the procedures leading to their issuance and surrounding their execution were adequate to avoid suppression of constitutionally protected publications. '. . . [T]he line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn. . . . The separation of legitimate from illegitimate speech calls for . . . sensitive tools . . . .' *Speiser v. Randall*, 357 U.S. 513, 525, [78 S.Ct. 1332, 2 L.Ed.2d 1460]. It follows that, under the Fourteenth Amendment, a State is not free to adopt whatever procedures it pleases for dealing with obscenity as here involved without regard to the possible consequences for constitutionally protected speech.

We believe that Missouri's procedures as applied in this case lacked the safeguards which due process demands to assure nonobscene material the constitutional protection to which it is entitled. *Marcus v. Search Warrant*, 367 U.S. at 729, 731, 81 S.Ct. at 1715.

While Initiative 335 does not authorize seizure of obscene material under warrant, it does, as has been described, authorize a judicial officer to restrain removal of contents or personal property of the place where a nuisance allegedly exists. Neither property nor contents may be removed from the premises under threat of contempt. Moreover, the court may order an accounting of all other business transac-

---

**19.** R.C.W. 7.48.078.

**20.** R.C.W. 7.48.080.

tions involving the stock in trade.[21] Such restraints are permissible under Initiative 335 before a judicial determination is made whether the material is obscene. Since the boundary between obscene and non-obscene material is difficult to draw, the inevitable result must be that constitutionally protected material will be swept along with the obscene. The central point made in *Marcus* was that the Missouri procedures failed to provide adequate constitutional protections for non-obscene material. Initiative 335 suffers from the same defect of permitting the suppression of protected expression.

▪ I have noted that some members of the Supreme Court now believe it impossible to define obscenity within the certainty required by law. Even more importantly, fundamental and sensitive constitutional rights are involved. Understandably, then, statutory prior restraints upon First Amendment rights in any setting must be carefully and closely drawn.

▪ The plaintiffs have attacked Initiative 335 as an unconstitutional prior restraint on freedom of expression. The defendants rejoin that prior restraints are not necessarily unconstitutional as long as they follow certain procedural requirements. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Under the *Freedman-Southeastern Promotions* test, three safeguards must be established before the prior restraint can withstand constitutional scrutiny. "*First,* the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. *Second,* any restraint prior to judicial review can be imposed only for a specified period and only for the purpose of preserving the status quo. *Third,* a prompt judicial determination must be assured." *Southeastern Promotions, supra,* at 560, 95 S.Ct. at 1247.

This tripartite test for prior restraints has been examined in a series of cases following *Freedman v. Maryland.*

In *Teitel Film Corp. v. Cusack,* 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968), the Court reviewed a Chicago film censorship ordinance which required a film exhibitor to obtain a permit from the Chicago Police Department prior to showing the film. An administrative and judicial appeals procedure was available when a permit was denied. The Court found that the procedure violated the second and third parts of the *Freedman* standard in that it allowed 50–57 days to complete the administrative process, and there was no provision for a prompt judicial decision.

United States Post Office regulations aimed at mailers of allegedly obscene material were examined in *Blount v. Rizzi,* 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971). Under the regulations, the Postmaster General made the determination that certain mailers were using the Post Office to convey materials or solicit money for materials which had been designated as obscene by the Postmaster General. In that event, the Postmaster General required the offending mail to be returned to the mailer. The mailer was prohibited from cashing postal money orders for the supposedly obscene mail. The Court found the regulations similar to those rejected in *Marcus v. Search Warrant,* and that they violated all three parts of the *Freedman* test.

The Court scrutinized another federal statute in *United States v. Thirty-Seven Photographs,* 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971) and found that the customs seizure of sexually-explicit photographs met the first and second parts of the standard. In regard to the third aspect, "a prompt final judicial determination", the Court examined the facts of the particular seizure and found that promptness would have been possible had the photographs' owner not challenged the statute. The Court concluded that since federal statutes can be saved by judicial construction if the construction does not require a rewriting of the statute and if the judicial construction is in accord with the statute's legislative

21. R.C.W. 7.48.062.

history, the customs seizure conformed to *Freedman.*

In *Heller v. New York,* 413 U.S. 483, 93 S.Ct. 2789, 37 L.Ed.2d 745 (1973), the Court affirmed the seizure of a single copy of a motion picture film which was seized as evidence after a judge of the New York Criminal Court viewed the film at a theatre and immediately signed a warrant. *Heller* amplified the Court's holding in *Lee Art Theatre v. Virginia,* 392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313 (1968) which provided that a full adversary hearing was not required before the seizing of a single piece of evidence if the prior judicial determination was constitutionally valid. The *Heller* decision carefully distinguished between seizure of individual pieces of evidence and prior restraints of quantities of material:

> Courts will scrutinize any large-scale seizure of books, films, or other materials presumptively protected under the First Amendment to be certain that the requirements of *A Quantity of Books* and *Marcus* are fully met.

> *Heller,* 413 U.S. at 491, 93 S.Ct. at 2794.

The most recent Supreme Court considerations of prior restraints emphasize the ongoing adherence to the *Freedman* test. As noted above, *Southeastern Promotions* is a direct affirmation of the standard. Further, in *McKinney v. Alabama,* 424 U.S. 669, 96 S.Ct. 1189, 47 L.Ed.2d 387 (1976) the Court reviewed Alabama's obscenity regulation scheme and found that it did not conform to the "necessary sensitivity to freedom of expression" required by *Freedman* and *Heller. McKinney,* at 674, 96 S.Ct. at 1193. The continuing concern with the heavy burden of prior restraint is seen in the Court's rejection of a state court's gag order in *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). While the issue in that case was not

obscenity, the Court's detailed discussion of prior restraint emphasized the constitutional limitations on censorship, and Justice Brennan's concurring opinion approvingly quoted a commentator's summary of the difficulties of such restraint:

> A system of prior restraint is in many ways more inhibiting than a system of subsequent punishment: It is likely to bring under government scrutiny a far wider range of expression; it shuts off communication before it takes place; suppression by a stroke of the pen is more likely to be applied than suppression through a criminal process; the procedures do not require attention to the safeguards of the criminal process; the system allows less opportunity for public appraisal and criticism; the dynamics of the system drive toward excesses, as the history of all censorship shows. T. Emerson, The System of Freedom of Expression 506 (1970)

> *Nebraska Press Assn. v. Stuart,* at 589–590, 96 S.Ct. at 2817.

While arguably satisfying the first and third parts of the *Freedman* test, Initiative 335 fails to meet the second requirement that any prior restraint may be imposed only for the purpose of preserving the status quo. As already pointed out, section 7 of the initiative [22] allows the court to issue an order "restraining the defendant and all other persons from removing or in any manner interfering with the personal property and contents of the place where such nuisance is alleged to exist . . . ." Since a defendant could under this provision be prohibited from disposing of all of his merchandise pending a judicial determination, the State could during the interim period effectively shut down a business charged with conducting a nuisance.[23] Instead of carefully limiting the scope of a

---

22. R.C.W. 7.48.062.

23. The provision is not saved by the limitation that ". . . pending such [judicial] decision the stock in trade may not be so restrained." Presumably, "stock in trade" means that merchandise not considered to be part of the moral nuisance. But since the initiative nowhere

defines the difference between "personal property and contents of the place where such nuisance is alleged to exist", which may be restrained, and "stock in trade", which may not be restrained, non-obscene as well as obscene material could be swept into the net of a restraining order.

restraining order to specific pieces of merchandise and allowing the business itself to continue to function, the initiative may well severely alter the status quo to the defendant's detriment.

Moreover, even if certain merchandise designated as "stock in trade" is not restrained, section 7 provides that "an inventory and full accounting of all business transactions may be required." Again, rather than maintaining the status quo, this provision imposes additional burdens on a defendant before a judicial determination of a moral nuisance has been made.

■ I therefore conclude that the initiative's procedures of prior restraint fail to withstand the strict scrutiny required of large-scale seizures of material protected under the First Amendment, *Heller,* and are therefore unconstitutional.

Another serious question arises in connection with the contempt provision of the initiative. As part of the enforcement power conferred by Initiative 335, any person found by a court to have violated any injunction prescribed by the initiative is subject to summary trial and punishment in the court which has issued the injunction. The contempt section [24] of the initiative provides in part:

> In case of the violation of any injunction granted under the provisions of RCW 7.48.050 through 7.48.100 as now or hereafter amended, the court or judge may summarily try and punish the offender. The proceedings shall be commenced by filing with the clerk of court an information under oath, setting out the alleged facts constituting such violation, upon which the court or judge shall cause an attachment to issue, under which the defendant shall be arrested. The trial may be had upon affidavits, or either party may demand the production and oral examination of the witnesses. A party found guilty of contempt under the provisions of this section shall be punished by a fine of not less than two hundred nor more than one thousand dol-

lars, or by imprisonment in the county jail not less than three nor more than six months, or by both fine and imprisonment.

Under the law, a variety of acts may subject the actor to summary contempt proceedings. Those acts include removing or mutilating a copy of the restraining order posted on the premises of the alleged nuisance; selling or projecting the allegedly obscene or pornographic books and films prior to a judicial determination; selling the stock in trade of a temporarily restrained establishment without keeping complete records of the transactions; and removing the contents and personal property of a restrained establishment.[25] While these forms of potential contempt differ, they will all ordinarily occur outside the direct presence of the court which has issued the temporary, preliminary or permanent injunction.

■ But summary punishment is reserved for direct contempt, and direct contempt is defined as that misbehavior which happens "under [the court's] own eye within its hearing", *Ex parte Terry,* 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405 (1888). As defined by a recent Ninth Circuit case arising in the State of Washington:

> Indirect contempt is contumacious behavior occurring beyond the eye or hearing of the court and for knowledge of which the court must depend upon the testimony of third parties or the confession of the contemnor.

*United States v. Marshall,* 451 F.2d 372, 373 (1971).

Indirect contempts as such cannot be tried in the summary manner of 7.48.080. Rather, as the United States Supreme Court emphasized over half a century ago:

> Due process of law, therefore, in the prosecution of contempt, except of that committed in open court, requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or

---

**24.** R.C.W. 7.48.080.

**25.** R.C.W. 7.48.080.

explanation. We think this includes the assistance of counsel, if requested, and the right to call witnesses to give testimony, relevant either to the issue of complete exculpation or in extenuation of the offense and in mitigation of the penalty to be imposed.
*Cooke v. United States,* 267 U.S. 517, 537, 45 S.Ct. 390, 395, 69 L.Ed. 767 (1925).

## CONCLUSION

I conclude that statutory procedures similar to those contained in Initiative 335 have not previously been sustained in the United States Supreme Court. I conclude that the initiative is overbroad and fails to provide sufficient safeguards for constitutionally protected expression. Procedures under the initiative amount to a constitutionally impermissible prior restraint upon freedom of speech.

As noted, the plaintiffs now before this court are threatened with the real and immediate prospect of prosecution under Washington's moral nuisance statute. The plaintiffs' businesses are the type of establishments that the statute purports to regulate. There is every reason to believe that the State of Washington, county or city prosecutors, or private citizens will imminently prosecute one or more of the plaintiffs on the basis of Initiative 335. As was noted by the Supreme Court in *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974):

> In these circumstances, it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights. *Steffel,* at 459, 94 S.Ct. at 1216.

In short, these plaintiffs and these defendants present an actual, continuing controversy to this court.

■ My examination of the statute enacted by Initiative 335 leads me to conclude that the statute is facially unconstitutional. A declaratory judgment finding a state law unconstitutional involves less of an intrusion into the practices and policies of a state than an injunction, *Steffel v. Thompson,*

and as I believe that the responsible state officers involved in this action will not prosecute under an unconstitutional statute, I find no present necessity for the issuance of an injunction.

Accordingly, I find that plaintiffs are entitled under 28 U.S.C. § 2201 to a declaratory judgment that Initiative 335 is unconstitutional on its face.