SPOKANE ARCADES, INC., a Washington corporation, Plaintiff,

v.

The Honorable Kenneth EIKENBERRY, as Attorney General of the State of Washington, in his representative capacity only; Donald C. Brockett, Prosecuting Attorney of Spokane County, in his representative capacity only; and James Sloane, Spokane City Attorney, in his representative capacity only, Defendants.

J–R DISTRIBUTORS, INC., Plaintiff,

v.

Kenneth EIKENBERRY, in his official capacity as Attorney General for the State of Washington; Donald C. Brockett, in his official capacity as Prosecuting Attorney, Spokane County, State of Washington; James Sloane, in his official capacity as City Attorney for the City of Spokane, Washington; Jeffery C. Sullivan, in his official capacity as Prosecuting Attorney for the County of Yakima, State of Washington; and Fred Andrews, in his official capacity as City Attorney for the City of Yakima, Washington, Defendants.

AZURE ENTERTAINMENT CORPORATION OF WASHINGTON, Plaintiff,

v.

Kenneth EIKENBERRY, in his official capacity as Attorney General for the State of Washington; Donald C. Brockett, in his official capacity as Prosecuting Attorney for Spokane County, State of Washington; and James Sloane, in his official capacity as City Attorney for the City of Spokane, Washington, Defendants.

PLAYTIME THEATRES, INC., a Washington corporation, Plaintiff,

v.

The Honorable Kenneth EIKENBERRY, as Attorney General of the State of Washington, in his representative capacity only; Donald C. Brockett, Prosecuting Attorney of Spokane County, in his representative capacity only; and James Sloane, Spokane City Attorney, in his representative capacity only and Norm Maleng, Prosecuting Attorney of King County in his representative capacity only, Defendants.

Jack BURNS, in his representative capacity as Executor of the Estate of Selom F. Burns, Plaintiff,

v.

The Honorable Kenneth EIKENBERRY, as Attorney General of the State of Washington, in his representative capacity only, Defendant.

The AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON: Madrona Publishers, Inc.; Superior Publishing Company; Washington Library Association; Pacific Northwest Booksellers Association; Motion Picture Exhibitors of Washington, Alaska, and Northern Idaho; Washington State Council of Teachers of English; Washington Library Media Association; and the Community College Librarian and Media Specialists' Association of Washington, Plaintiffs,

v.

The Honorable Kenneth EIKENBERRY, as Attorney General of the State of Washington, in his representative capacity only, Defendant.

KUKIO BAY PROPERTIES, INC., a Washington corporation, Plaintiff,

v.

Norm MALENG, Prosecuting Attorney of King County, in his representative capacity only, Defendant.

Nos. C–82–223 RJM, C–82–230 RJM, C–82–231 RJM, C–82–239 RJM, C–82–240 RJM, C–82–283 RJM and C–82–354 RJM.

United States District Court,
E. D. Washington.

July 2, 1982.

Jack R. Burns, Hubbard, Burns & Meyer, Kirkland, Wash., Robert Eugene Smith, Encino, Cal., for plaintiff in No. C–82–223.

John H. Weston, David M. Brown, Brown, Weston & Sarno, Beverly Hills, Cal., Carl Maxey, The Maxey Law Firm, Spokane, Wash., for plaintiffs in Nos. C–82–230 and C–82–231.

Jack R. Burns, Hubbard, Burns & Meyer, Kirkland, Wash., for plaintiff in No. C–82–239.

Charles Stixrud, Seattle, Wash., Jack R. Burns, Hubbard, Burns & Meyer, Kirkland, Wash., for plaintiff in No. C–82–240.

James Lowe, Bogle & Gates, Seattle, Wash., for plaintiff in No. C–82–283.

Jack R. Burns, Hubbard, Burns & Meyer, Kirkland, Wash., for plaintiff in No. C–82–354; Robert Eugene Smith, Encino, Cal., Arthur Schwartz, Denver, Colo., of counsel.

Jeffrey C. Sullivan, Pros. Atty., Yakima, Wash., for defendant Sullivan.

Kenneth O. Eikenberry, Atty. Gen. of Wash., Christine Gregoire, Sr. Asst. Atty. Gen., Thomas F. Carr, Asst. Atty. Gen., Spokane, Wash., for defendant Eikenberry.

Donald C. Brockett, Spokane County Pros. Atty., Spokane, Wash., for defendant Brockett.

Richard C. Robinson, Asst. Corp. Counsel, Spokane, Wash., for defendant Sloane.

Charles S. Hamilton, III, Deputy Pros. Atty. Civ. Div., Seattle, Wash., for defendant Maleng.

## MEMORANDUM DECISION

ROBERT J. McNICHOLS, Chief Judge.

The issue in these consolidated cases[1] is the constitutionality of House Bill 626, an Act passed by the Washington Legislature regulating pornography and moral nuisances.[2] Plaintiffs have asked for extraordinary relief declaring the statute unconstitutional and enjoining its enforcement. Specifically, it is argued that provisions of the Act are overbroad and vague, and that the statute is more restrictive than the standard mandated by the United States Supreme Court, that it has a chilling effect on First Amendment freedoms, imposes cruel and unusual punishment, and is framed in violation of Washington State's constitution.

In passing upon the constitutionality of this Act, I have broken down discussion into three broad generic topics: (1) the substantive provisions, particularly in terms of the definitions employed; (2) the procedural aspects with emphasis on due process requirements; and (3) state constitutional questions.

█ Jurisdiction is founded on the Federal Question Statute, 28 U.S.C. § 1331. It should be noted at the outset that defendants' arguments in favor of general abstention are rejected. Where a claim is predicated upon alleged abridgement of First Amendment rights, a federal court should abstain only in the face of special circumstances. *Zwickler v. Koota*, 389 U.S. 241, 252, 88 S.Ct. 391, 397, 19 L.Ed.2d 444 (1967). The extenuating factors referenced in that decision are not present here.

█ Second, I adhere to the well settled proposition that statutes, when tested for constitutionality, must be construed in a common sense rather than hypertechnical fashion. *See United States Civil Service Comm. v. Natl. Ass'n of Letter Carriers*, 413 U.S. 548, 579, 93 S.Ct. 2880, 2897, 37 L.Ed.2d

796 (1973); *United States v. Vuitch*, 402 U.S. 62, 72, 91 S.Ct. 1294, 1299, 28 L.Ed.2d 601 (1971).

## I. SUBSTANTIVE PROVISIONS

█ Since *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), there can be no question but that society has the right to regulate, or to proscribe completely, the dissemination of sexually oriented material found repugnant to prevailing moral standards. *Miller* mandates that such matter, in order to fall outside the ambit of protected speech or activity, must fail a tripartite test:

> The basic guidelines for the trier of fact must be: (a) whether "the average person, applying contemporary community standards" would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

413 U.S. at 24, 93 S.Ct. at 2614 (citations omitted).

The parties are in solid agreement that this test is the well established law of the land and is unquestionably controlling in the instant case. Somewhat less mutuality of thought is apparent with regard to application of the individual prongs to HB 626, with the plaintiffs arguing that the Act deviates significantly from settled definitions accorded a number of instrumental terms, and is thereby impermissibly both overbroad and vague.

With *Miller* as the analytical cornerstone, the task before the Court is to weigh plaintiffs' objections in light of the evolving body of case law springing forth since that seminal decision.

---

1. Objection has been raised concerning the standing of several plaintiffs to participate in this action. I share in the reservation that some of these parties might more properly be cast in the role of amicus than as litigants. In view of the disposition of this matter, however, the question is largely academic.

2. *Wash.Sess.Laws*, ch. 184, 47th Legis. (effective April 1, 1982).

Plaintiffs attack the statute's definitions on a number of fronts. The textual portion of HB 626 which restates the *Miller* test [3] does exhibit some deviation from the language employed by the Supreme Court. Section 1(2), for example, reads: " 'Lewd matter' is synonymous with 'obscene matter' ...." Section 1(3) is worded: " 'Lewdness' shall have and include all those meanings which are assigned to it under the common law." Reading these sections together, it may appear at first blush that the statute purports to impose a common law definition of obscenity in derogation of well-settled precedent. A careful reading of the bill, however, reveals that neither the terms "lewd" nor "lewdness" are employed in any substantive manner. In no way do they alter or impair the test for obscenity. Rather, these appellations are merely descriptive in nature. Indeed, under the statute's own terms, one must mentally substitute "obscene" wherever the term "lewd" is used.

Section 1(2)(a) is a virtually verbatim adoption of the first prong of the *Miller* test. Section 1(8), however, arguably impacts the integrity of that prong by defining "prurient" as "that which incites lasciviousness or lust." Plaintiffs contend that "prurient" has a more circumscribed meaning, and point to case law noting in dicta that prurient interest entails "a shameful or morbid interest in nudity, sex, or excretion." *Roth v. United States*, 354 U.S. 476, 487 n.20, 77 S.Ct. 1304, 1310 n.20, 1 L.Ed.2d 1498 (1957). At the same time, however, *Roth* in actuality settled upon a shortened definition, *i.e.*, "material having a tendency to incite lustful thoughts." *Id.*[4]

At the risk of becoming enmeshed in semantical nitpicking, it should be noted that section 1(8) does not define what is obscene. That is a function of the conjunctive tripartite test. Rather, the section defines what is pornographic.

The material we are discussing in this case is more accurately defined as "pornography" or "pornographic material." "Pornography" derives from the Greek (*porne*, harlot, and *graphos*, writing). The word now means " ... a depiction (as in writing or painting) of licentiousness or lewdness: a portrayal of erotic behavior designed to cause sexual excitement." *Miller, supra*, 413 U.S. at 19 n.2, 93 S.Ct. at 2612 n.2.

■ Contrary to the layman's conception, "pornography" and "obscenity," when utilized as legal words of art, are not interchangeable in application, the former being a subspecies of the latter. *Id. See also Spokane Arcades v. Ray*, 449 F.Supp. 1145, 1151–52 n.6 (E.D.Wash.1978), *aff'd sub nom. Spokane Arcades v. Brockett*, 631 F.2d 135 (9th Cir. 1980), *aff'd* —— U.S. ——, 102 S.Ct. 557, 70 L.Ed.2d 468 (1981). That is to say, pornography is descriptive of the sexual character of erotic material and is not necessarily obscene. Before that latter label will attach, the material in question must also fail the second and third prongs of the *Miller* test. Thus, I have no difficulty whatever with the fact that §§ 1(2)(a) and 1(8) when read together define only

---

**3.** (2) "Lewd matter" is synonymous with "obscene matter" and means any matter:
(a) Which the average person applying contemporary community standards, would find, when considered as a whole, appeals to the prurient interest; and
(b) Which explicitly depicts or describes patently offensive representations or descriptions of:
(i) Ultimate sexual acts, normal or perverted, actual or simulated; or
(ii) Masturbation, fellatio, cunnilingus, bestiality, excretory functions, or lewd exhibition of the genitals or genital area; or
(iii) Violent or destructive sexual acts, including not [sic] not limited to human or animal mutilation, dismemberment, rape or torture; and
(c) Which, when considered as a whole, and in the context in which it is used, lacks serious literary, artistic, political, or scientific value.

**4.** Whatever may be the value of dissenting opinions, I note with some interest that Justice Douglas placed the same construction on the decision's ultimate definition. In order for material to be prurient under the majority opinion, "[a]ll it need do is to incite a lascivious thought or arouse a lustful desire." *Roth, supra*, 354 U.S. at 514, 77 S.Ct. at 1324 (Douglas, J., dissenting).

pornography and not obscenity. The rationale of *Miller* and progeny is still served and there can be little doubt but that jurors will have sufficient command of the common meanings ascribed to lust and lasciviousness to properly characterize material in accord with the first prong of *Miller.*

Plaintiffs also call into question section 1(2)(b) which describes those representations or depictions which, when presented in a patently offensive manner, will satisfy the second *Miller* prong. Objection is raised with respect to both §§ 1(2)(b)(ii) and (iii). The former proscribes depictions of "[m]asturbation, fellatio, cunnilingus, bestiality, excretory functions, or lewd exhibition of the genitals or genital area." It is argued that this list is more expansive than the examples suggested by *Miller.* *See* 413 U.S. at 25, 93 S.Ct. at 2615. So it is, but I find the additions to be permissible under the doctrine of *ejusdem generis.* *Cf. Ward v. Illinois*, 431 U.S. 767, 773–75, 97 S.Ct. 2085, 2089–90, 52 L.Ed.2d 738 (1977); *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 52, 93 S.Ct. 2628, 2632, 37 L.Ed.2d 446 (1973). The *Miller* Court very pointedly noted that the list promulgated in that decision was by no means exhaustive.

> We emphasize that it is not our function to propose regulatory schemes for the States. That must await their concrete legislative efforts. It is possible, however, to give a *few plain examples* of what a state statute could define for regulation ....

*Id.* at 25, 93 S.Ct. at 2615 (emphasis added); *see also Hamling v. United States*, 418 U.S. 87, 114, 94 S.Ct. 2887, 2906, 41 L.Ed.2d 590 (1974).

The additional proscriptions of HB 626, *i.e.*, bestiality, fellatio, and cunnilingus, are well within the spirit of *Miller*, and indeed, as held by one recent persuasive decision, such increase in specificity actually reduces the basis for claims of vagueness. *Red Bluff Drive-In v. Vance*, 648 F.2d 1020, 1026 (5th Cir. 1981), *cert. denied sub nom. Theatres West v. Holmes*, —— U.S. ——, 102 S.Ct. 1264, 71 L.Ed.2d 453 (1982).

Plaintiffs also find objectionable on two counts § 1(2)(b)(iii) which proscribes "[v]iolent or destructive sexual acts, including but not limited to human or animal mutilation, dismemberment, rape or torture ...." It is contended first that the language "including but not limited to" runs afoul of the specificity mandated by *Miller.* 413 U.S. at 24, 93 S.Ct. at 2614. I am not persuaded. The phrase at issue is modified by the language "violent or destructive sexual acts," and I am confident that courts called upon to construe any future application of this section will be guided by that limiting phraseology. So viewed, the following quote from *Miller* becomes instructive:

> If a state law that regulates obscene material is thus limited, as written *or construed*, the First Amendment values applicable to the States through the Fourteenth Amendment are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary.

413 U.S. at 25, 93 S.Ct. at 2615 (emphasis added).

With the same confidence in the integrity and wisdom of the appellate process as is evidenced by the foregoing passage, I cannot find the phrase complained of either facially overbroad or vague.

The second objection concerns reference to animals. The uninitiated might express some wonderment as to what possible nexus there might be between violent or destructive behavior directed toward animals and sexual materials. Such curiosity is quickly sated with a reading of *Miller v. Reddin*, 293 F.Supp. 216 (C.D.Cal.1968), *rev'd on procedural grounds*, 422 F.2d 1264 (9th Cir. 1970). *See also Red Bluff Drive-In, supra*, 648 F.2d at 1026. Plaintiffs' announced fear that depictions of hunting might fall within the proscriptions of HB 626 is totally specious.

Finally, the third prong of *Miller*, as embodied in § 1(2)(c), is also attacked by plaintiffs as an impermissible expansion of settled precedent. This section provides that material failing the first two prongs which also, "when considered as a whole, and in

the context in which it is used, lacks serious literary, artistic, political, or scientific value" will be deemed obscene. Objection is taken to the phrase "in the context in which it is used."

Were this language found in either the first or second prongs, which are the province of the jury and already highly subjective in nature, this modification of *Miller* might prove more troubling. In the first prong, the question would be whether material was prurient "in the context in which it is used." In the second, the question would be whether such matter was depicted in a patently offensive manner "in the context in which it is used." As plaintiffs point out, it is possible to conceive of situations in which this phrase could add yet another speculative factor. *United States v. Various Articles*, 600 F.2d 394 (2d Cir. 1979). *But see Ward v. Illinois*, 431 U.S. 767, 770 n.1, 97 S.Ct. 2085, 2088 n.1, 52 L.Ed.2d 738 (1977) (contextual test approved by implication).

However, such is not the case here. By inserting the phrase in the third prong, *i.e.*, the objective test, this language, if anything, serves a limiting function and enhances the specificity with which a trial court must address the existence of literary, artistic, political, or scientific value. Viewed from another angle, it is difficult to see how the redeeming value of ostensibly obscene material can be "considered as a whole" without at the same time looking at the context. *See generally, Pinkus v. United States*, 436 U.S. 293, 303–04, 98 S.Ct. 1808, 1814–15, 56 L.Ed.2d 293 (1978).

For the foregoing reasons, I conclude that Washington's statutory scheme comports with the minimum requirements of *Miller* insofar as HB 626 sets forth substantive testing procedures in a constitutionally acceptable framework.

## II. PROCEDURAL ASPECTS

### A. Prior Restraint

Unquestionably, prior restraint of expression has long and consistently been viewed with deep and abiding suspicion. *Vance v.*

*Universal Amusement Co.*, 445 U.S. 308, 316 n.13, 100 S.Ct. 1156, 1161 n.13, 63 L.Ed.2d 413 (1980) and authorities cited therein. In considering argument raising the spectre of such restraint, however, there is a basic premise which should be borne in mind:

> There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any constitutional problem. *These include the lewd and obscene .... It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality ....*

*Roth v. United States*, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957) (emphasis original) quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 769–69, 86 L.Ed. 1031 (1942).

It is now settled beyond dispute that obscenity stands outside the umbrella of the Constitution. *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 69, 93 S.Ct. 2628, 2641, 37 L.Ed.2d 446 (1973). As unprotected activity, lawfully punishable by sanctions, the promotion of obscenity stands in no different posture than would any other activity inimical to the public interest and subject to criminal penalties. It is beyond argument that a primary objective of sanctions is that of deterrence. Thus, if plaintiffs feel that HB 626 serves as a prior restraint on their ability or willingness to engage in activities proscribed under the statute, then it can only be concluded that the Act will serve its intended, and lawful, purpose.

Such a construction, however, is an oversimplification, since the thrust of plaintiffs' argument is that the existence of HB 626 may have an inhibitory effect on protected activity as well as unprotected. The burden of drawing what may often be a fine line between the two, it is contended, will fall upon them; and an error in judgment may result in prosecution prior to an

adjudication of obscenity, or in self-imposed censorship.

The flaw in this approach is that it is predicated on the assumption that one cannot make an initial determination as to the nature of a given work and is at the mercy of a post facto adjudication. As a corollary, a further assumption is implied that the test for obscenity is so vague and unfathomable that it serves no definitive purpose. I am unable to so conclude. For reasons stated previously, HB 626 comports with the substantive standard enunciated by *Miller*. Undoubtedly, "the line between legitimate and illegitimate speech is often . . . finely drawn." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975). Nonetheless, it is not the function of this Court to cast doubts upon the efficacy of a Supreme Court decision which has stood the test of time without major modification. For the same reasons which validate a jury's ability to render a rational determination of obscenity, one charged with promotion is equally able to reach his own decision. "Simply stated, hard core pornography . . . can and does speak for itself." *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 56 n.6, 93 S.Ct. 2628, 2634 n.6, 37 L.Ed.2d 446 (1973) quoting with approval, *United States v. Wild*, 422 F.2d 34, 36 (2d Cir. 1970), *cert. denied*, 402 U.S. 986, 91 S.Ct. 1644, 29 L.Ed.2d 152 (1971). Subjective variables are most certainly present in reaching such a determination, but these are no more imponderable than those representing elements of any number of malum prohibitum offenses.

> That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense . . . . The Constitution has erected procedural safeguards to protect against conviction for crime except for violation of laws which have clearly defined conduct thereafter to be punished; but the Constitution does not require impossible standards. The language here challenged conveys suffi-

ciently definite warning as to the proscribed conduct when measured by common understanding and practices. The Constitution requires no more.

*United States v. Petrillo*, 332 U.S. 1, 7–8, 67 S.Ct. 1538, 1541–42, 91 L.Ed. 1877 (1947) (citations omitted).

Nor does placing the burden of prior determination upon the promoter present any insurmountable difficulty:

> The Constitution requires proof of scienter to avoid the hazard of self-censorship of constitutionally protected material and to compensate for the ambiguities inherent in the definition of obscenity.

*Mishkin v. New York*, 383 U.S. 502, 511, 86 S.Ct. 958, 964, 16 L.Ed.2d 56 (1966); *See also Smith v. California*, 361 U.S. 147, 153, 80 S.Ct. 215, 218, 4 L.Ed.2d 205 (1959). The statutory scheme defining scienter approved in *Mishkin* parallels section 1(1) of HB 626 and I am satisfied that the Act meets minimum constitutional requirements in this regard.

### B. Civil Penalty

■ As an initial proposition, there is no per se constitutional constraint against the imposition of civil sanctions for obscenity-related offenses:

> We need not linger over the suggestion that something can be drawn out of the Due Process Clause of the Fourteenth Amendment that restricts [a state] to the criminal process in seeking to protect its people against the dissemination of pornography. It is not for this Court thus to limit the State in resorting to various weapons in the armory of the law. Whether proscribed conduct is to be visited by a criminal prosecution or by a *qui tam* action or by an injunction or by some or all of these remedies in combination, is a matter within the legislature's range of choice. If [a state] chooses to subject persons who disseminate obscene "literature" to criminal prosecution and also to deal with such books as deodands of old, or both, *with due regard, of course, to appropriate opportunities for the trial of the underlying issue,* it is not for us to gainsay its selection of remedies.

*Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 441, 77 S.Ct. 1325, 1327, 1 L.Ed.2d 1469 (1957) (citations omitted) (emphasis added).

The highlighted language is the crux of the problem. If HB 626 dealt with injunctive procedures, arguably of a prior restraint nature and subject to judicial enforcement through contempt proceedings, there would be a wealth of case law against which to weigh the propriety of the Act. *E.g., Vance v. Universal Amusement Co., Inc.*, 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980); *Walker v. City of Birmingham*, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). If the statute envisioned a system of administrative controls, such as licensing, there would likewise exist dispositive Supreme Court decisions. *E.g. Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

Here, however, the statute is in the nature of what *Kingsley* refers to as a *qui tam* action and this court is largely without precedential guidance. One thing is certain. There can be no deviation from the tripartite *Miller* test:

> While this procedure is civil in nature, and does not directly involve the state criminal statute proscribing exhibition of obscene material, the Georgia case law permitting civil injunction does adopt the definition of "obscene materials" used by the criminal statute.

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 54, 93 S.Ct. 2628, 2633, 37 L.Ed.2d 446 (1973).

While *Paris* concerned an injunctive action, I think it unmistakable that in any adjudication of obscenity, there can be only one criteria, and that is as set forth in *Miller*. HB 626 satisfies this requirement in that section 1 thereof is fully applicable to both civil and criminal phases of the Act.

Nor does application of rules of evidence or civil procedure present cause for concern since section 3(3) provides that:

> The rules of evidence, burden of proof, and all other rules of court shall be the court rules generally applicable to civil cases in this state: *Provided*, That the standard of proof on the issue of obscenity shall be clear, cogent, and convincing.[5]

 Further, although far from a settled issue, a civil action should require the same element of scienter as is mandated in criminal prosecutions. *Grove Press, Inc. v. Flask*, 326 F.Supp. 574, 578 (N.D.Ohio 1970), *vacated on other grounds*, 413 U.S. 902, 93 S.Ct. 3026, 37 L.Ed.2d 1013 (1973). Once again, HB 626 satisfies this requirement. *See* §§ 1(1); 4(2).

Two remaining areas are somewhat disconcerting. The first involves the use of a jury as a finder of fact:

> In resolving the inevitably sensitive questions of fact and law, we must continue to rely on the jury system, accompanied by the safeguards that judges, rules of evidence, presumption of innocence, and other protective features provide, as we do with rape, murder, and a host of other offenses against society and its individual members.

*Miller, supra*, 413 U.S. at 26, 93 S.Ct. at 2616 (1973).

It is true that the *Miller* Court was addressing criminal prosecutions in drafting the foregoing, but it is also true that if this language were to be construed as applying *only* to criminal actions, it would be both gratuitous and superfluous. The same rationale which mandates the jury system as the most accurate barometer of contemporary community standards applies with equal force in the civil arena. The wording of section 3(3) would imply that it was the legislative intent to preserve a defendant's access to the jury. Nonetheless, I am troubled by the possibility that Washington's Constitution may not necessarily mandate such a result.

*Bros. Santa Ana Theatre*, 454 U.S. 90, 102 S.Ct. 172, 70 L.Ed.2d 262 (1981).

---

**5.** Within the civil context, the evidentiary standard of "clear, cogent, and convincing" is constitutionally adequate. *Cooper v. Mitchell*

Under Const. art. 1, § 21, the right of trial by jury shall remain inviolate.... In civil cases, a jury is available if a statute so provides or if the matter is one which was triable before a jury when the constitution was adopted.

*State v. Anderson*, 94 Wash.2d 727, 728, 620 P.2d 76 (1980). *See also* Wash.Ct.R. (Cr) 38(a).

Whether Washington courts would ultimately determine that a *qui tam* action such as contemplated under HB 626 "was triable before a jury when the [state] constitution was adopted" is a matter yet unsettled. In passing upon the constitutionality of the Act vis a vis the question of trial by jury in civil prosecutions, I do so with the understanding that the legislature incorporated such right through the wording of § 3(3).

A second area of concern lies in § 4(2) which provides:

Upon a determination that a defendant has with knowledge maintained a moral nuisance, the court shall impose a civil penalty and judgment of an amount as the court may determine to be appropriate. In imposing the civil penalty, the court shall consider the wilfulness of the defendant's conduct and the profits made by the defendant attributable to the moral nuisance.

Plaintiffs characterize this section as allowing for unlimited fines which could potentially close an establishment's doors as effectively as would a padlock. It is contended that such potential carries with it all the hallmarks of prior restraint. I am not persuaded. For reasons already stated, sanctions imposed after an adjudication of obscenity affect only accomplished behavior and do not rise to the level of either prior restraint or an impermissible chilling effect. In summarizing previous discussion, the following quote is appropriate:

[P]laintiffs attack the state statutory scheme as imposing unnecessarily broad and sweeping penalties on the distribution of obscene matter in order to chill the dissemination of borderline protected materials. We disagree. The penalties

in the instant scheme are only to be imposed after a full adversary hearing and a judicial determination on the merits. No penalty will be imposed unless the materials are adjudicated or admitted to be obscene and the requisite scienter was present....

The cases cited by plaintiffs are inapposite.... Each of these cases involves penalties or burdens being placed by administrative bodies upon an individual exercising his First Amendment rights. [This statute] specifically requires an adversary hearing and a judicial determination before any speech or material may be enjoined or any penalties imposed.

*Grove Press, supra*, 326 F.Supp. at 579–80 (citations omitted).

Further, contrary to plaintiffs' assertion, a penalty, while not circumscribed in terms of dollars, is limited in a sufficiently concrete manner to avoid any Fifth Amendment "taking" issue. The statute clearly provides that in imposing a penalty, the court must have in mind both "the wilfulness of the defendant's conduct and the profits made by the defendant attributable to the moral nuisance." Section 4(2). So prescribed, the rationale of *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) is instructive. In considering the constitutionality of forfeiture of property used in transporting contraband, the Court first reviewed historical development of the "deodand" concept, then held that the modern counterpart found in forfeiture statutes serves appropriate "punitive and deterrent purposes .... both by preventing further illicit use of the conveyance and by imposing an economic penalty, thereby rendering illegal behavior unprofitable." *Id.* at 686–87, 94 S.Ct. at 2093–94. The same motivating rationale is eminently served by forfeiture of illegal profits in the instant case.

This is not a situation where a trial court may act with unlimited discretion and without predefined and objectively articulated standards. Rather, the court must ascertain the nature and extent of ill-gotten gains, *after* an adjudication of illegality,

and impose penalties accordingly. The underlying purpose of such fines thus bears a rational relationship to the activity sought to be proscribed, and is entirely within legitimate parameters of the state's police powers. In summary, the purpose is:

> not to prevent future expression, but to punish past illegal conduct by depriving the violator of economic gain. That is a permissible state objective, implemented by permissible means.

*State ex rel. Kidwell v. United States Marketing, Inc.*, 102 Idaho 451, ——, 631 P.2d 622, 628 (1981), *appeal dismissed per stip.*, —— U.S. ——, 102 S.Ct. 1649, 71 L.Ed.2d 878 (1982).

Considering both the existence of a reasonable nexus between the activity sought to be interdicted and the means chosen to accomplish that end, and the fact that penalties are levied only after a full adversary hearing accompanied by the panoply of procedural safeguards, the hollowness of plaintiffs' position in the instant case is well illustrated by the following quotation from *Kidwell.*

> [I]f a bookseller, having fallen behind on his property taxes, loses his bookstore at a tax sale, he will not be heard to complain that the state imposed an unlawful prior restraint upon his bookselling activities. If the same bookseller is convicted of the crime of distributing obscene materials, he may be imprisoned, and yet he will not be heard to complain that his incarceration constitutes a prior restraint upon his ability to disseminate protected speech, even though it is quite clear that it has that effect.
>
> \* \* \* \* \* \*
>
> Like a tax sale, the forfeiture is directed strictly at property, apart from the content of any expression contained therein. And like imprisonment for a criminal obscenity transgression, the forfeiture is in-

tended to penalize past distributions of illegal and unprotected obscenity.

*Id.* at ——, 631 P.2d at 627–28 [6]

## C. Criminal Penalty

It is argued that stiff criminal penalties of up to $50,000 per violation run afoul of both equal protection and cruel and unusual punishment prohibitions. The well-settled rule is that:

> Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.
>
> \* \* \* \* \* \*
>
> [F]or crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative.

*Rummel v. Estelle*, 445 U.S. 263, 272–74, 100 S.Ct. 1133, 1138–39, 63 L.Ed.2d 382 (1980).

Legislative authority is not wholly free of restraint, of course. Where a punishment is completely without a rational nexus to legitimate social goals, the principal of proportionality may be applicable. *Id.* at 274 n.11, 100 S.Ct. at 1139 n.11; *see also Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977). The key, therefore, to the validity of a given punishment lies in the magnitude of societal interest at stake.

> The sum of experience, including that of the past two decades, affords an ample basis for legislatures to conclude that a sensitive, key relationship of human existence, central to family life, community welfare, and the development of human personality, can be debased and distorted by crass commercial exploitation of sex.
>
> \* \* \* \* \* \*
>
> The issue in this context goes beyond whether someone, or even the majority, considers the conduct depicted as

---

**6.** The statute approved in *Kidwell* goes far beyond the sanctions contemplated in HB 626 providing, as it does, for a one year closure of any establishment found to be a moral nuisance.

"wrong" or "sinful." The States have the power to make a morally neutral judgment that public exhibition of obscene material, or commerce in such material, has a tendency to injure the community as a whole, to endanger the public safety, or to jeopardize, in Mr. Chief Justice Warren's words, the States' "right . . . to maintain a decent society."

*Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 63–69, 93 S.Ct. 2628, 2638–2641, 37 L.Ed.2d 446 (1973).

■ In view of the state's compelling interest in controlling commercial obscenity, I conclude that there is a rational connection between the criminal penalties contemplated in HB 626 and the governmental objective of regulating pornography. It is well within the prerogative of the legislature to impose sanctions which are more than merely a cost of doing business.

## III. STATE CONSTITUTIONAL QUESTIONS

*A. More than one subject in title:*

Article 2, Section 19 of the Washington State Constitution provides: "No bill shall embrace more than one subject, and that shall be expressed in the title." It is argued that HB 626, which relates to both pornography and moral nuisance, must be struck down as an impermissible joinder of discrete subjects. The Washington judiciary has never read the applicable provision so narrowly.

We do not agree that the initiative covers a multiplicity of subjects or subjects that are not reasonably related. On the contrary, each of the subtopics of [the initiative] bears a close interrelationship to the dominant intendment of the measure. We have repeatedly held that

where the title embraces a general subject it is not violative of the constitution even though the general subject contains incidental subjects. All that is required is that there be some "rational unity" between the general subject and the incidental subdivisions. *Kueckelhan v. Federal Old Line Ins. Co.*, 69

Wn.2d 392, 418 P.2d 443 (1966); *Robison v. Dwyer*, 58 Wn.2d 576, 364 P.2d 521 (1961).

*Water Dist. 105 v. State*, 79 Wash.2d 337, 341, 485 P.2d 66 (1971).

*Fritz v. Gorton*, 83 Wash.2d 275, 290, 517 P.2d 911, 920–21 (1974).

Even where the subjects at issue might be discrete if viewed in the abstract, it is incumbent upon the court to go a step further and take a practical construction of such subjects in light of the scope of a given measure. *Goodner v. Chicago, Mil. Etc. R. Co.*, 61 Wash.2d 12, 23, 377 P.2d 231, 237–38 (1962). Stated another way, it is the legislative *purpose* which is the critical focal point, and:

all matters which are naturally and reasonably connected with it, and all measures which will, or may, facilitate the accomplishment of the purpose so stated, are properly included in the act and are germane to its title.

*Gruen v. State Tax Comm.*, 35 Wash.2d 1, 22–23, 211 P.2d 651, 664 (1949).

More concretely yet, the Washington Supreme Court has held that:

To constitute plurality of subject, an act must embrace two or more *dissimilar and discordant* subjects, that by no fair intendment can be considered as having any legitimate connection with or relation to each other. Within the meaning of the constitutional provision, matters which apparently constitute distinct and separate subjects are not so where they are not incongruous and diverse to each other.

*Casco Co. v. Public Util. Dist. No. 1*, 37 Wash.2d 777, 790–91, 226 P.2d 235, 242 (1951).

■ The purpose of a title is to put interested persons on notice of the subject matter in a manner sufficient to prompt "inquiry into the body of the act" if one should wish to do so; and where "a title is broad and comprehensive, it will be liberally construed." *State v. Charboneau's*, 27 Wash.App. 5, 9–10, 615 P.2d 1321, 1324, *rev. denied*, 94 Wash.2d 1021 (1980). *See also State v. Winters*, 67 Wash.2d 465, 466, 407 P.2d 988, 989 (1965).

■ I am unable to conclude that pornography and moral nuisances are so discordant and inimical to one another as to be without "rational unity." Indeed, under the language of section 2 of HB 626, it would appear that the former is subsumed into the latter. Certainly the title is "broad and comprehensive" enough to put any reasonable legislator on notice as to the nature and scope of the law. A constitutional challenge based on Article 2, section 19 must therefore fail.

### B. Emergency Clause

During the height of the populist movement in 1912, the electorate adopted amendment 7 to the state constitution which provided, *inter alia*, for reservation of the power of referendum.

> The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing institutions,
> . . .

Wash. Const. art. 2, § 1(b). *See generally Fritz v. Gorton*, 83 Wash.2d 275, 279–84, 517 P.2d 911, 915–17 (1974); *State ex rel. Blakeslee v. Clausen,* 85 Wash. 260, 264 *et seq.,* 148 Pac. 28, 30 *et seq.* (1915) for an historical and philosophical perspective on direct legislation.

Analytical emphasis has ebbed and flowed over the course of time depending upon the complement of the court at any given historical moment and the comparative trust members of the judiciary placed in the legislature vis a vis the electorate. Perhaps nothing has changed since the following observation issued some sixty-seven years ago:

> There has been a wide inconsistency in the holding of the courts upon constitutional questions. They have declared that, where the legislature has said there is an emergency, although undefined, its declaration is final and conclusive upon all. At the same time, and in the same day, they have not hesitated to declare acts of the legislature to be in derogation of the fundamental law or some of the legislative limitations of the constitution.

*State ex rel. Brislawn v. Meath*, 84 Wash. 302, 307, 147 Pac. 11, 13 (1915).

While as a practical matter the foregoing may still carry a ring of truth, there has been a decided shift in recent years away from a presumption of constitutionality of emergency legislation in favor of exploring the factual foundation supporting a declaration of emergent circumstances. Just twenty years ago, the firm rule was:

> With regard to the weight to be given such clauses [of the existence of an emergency], the rule to which this court has most consistently adhered, is that most recently stated in *State ex rel. Pennock v. Coe*, 42 Wn.(2d) 569, 257 P.(2d) 190, quoting from *State ex rel. Pennock v. Reeves*, 27 Wn.(2d) 739, 179 P.(2d) 961:
>
> > . . . such legislative declaration of emergency and necessity for the enactment is conclusive and must be given effect, unless the declaration on its face is obviously false; and, in determining the truth or falsity of the legislative declaration, we will enter upon no inquiry as to the facts, but must consider the question from what appears upon the face of the act, aided by the court's judicial knowledge. *State ex rel. Hamilton v. Martin*, 173 Wash. 249, 23 P.(2d) 1. We must give to the action of the legislature and its declaration of an emergency every favorable presumption.

*State ex rel. Hoppe v. Meyers*, 58 Wash.2d 320, 326, 363 P.2d 121, 125 (1961).

This rule was questioned in *State ex rel. Humiston v. Meyers*, 61 Wash.2d 772, 380 P.2d 735 (1963). In reviewing precedent, the court noted that:

> The touchstone of the rule is ". . . what appears upon the face of the act, aided by the court's judicial knowledge."
>
> The face of the act [in this case] is patently devoid of any facts relating to an emergency (with the exception of the emergency clause itself). The act repeals

nothing; it appropriates nothing; it taxes nothing. In nowise is the act comparable to the act considered by the court in *State ex rel. Hamilton v. Martin*, 173 Wash. 249, 23 P.(2d) 1 (1933), wherein the acts recited *facts* showing an emergent situation, which facts were, for the most part, capable of judicial knowledge. We do not indicate that the inclusion of a legislative declaration of policy in an act would, ipso facto, remove the emergency clause from the ambit of the court's constitutional duty to project and test the clause upon the backdrop of the constitution.

*Id.* at 778, 380 P.2d at 739.

█ Intermediate appellate courts have since picked up the *Humiston* approach and refined its thrust more narrowly.[7] Bypassing the line of authority relied upon in *Hoppe v. Meyers, supra*, the court in *Swartout v. City of Spokane*, 21 Wash.App. 665, 586 P.2d 135 (1978), *rev. denied*, 91 Wash.2d 1023 (1979) reached back in time to offer the following elucidation:

[I]t [is] too clear to require argument that the legislature cannot defeat the constitutional right, reserved by the people [the right of referendum] .... by *merely* inserting in an act the [language contained in the exception] ....

\* \* \* \* \* \*

Such a label may obviously be utterly and completely false. It would be scandalous indeed if the constitutional right of referendum could be thwarted by the mere use of false labels. As was said in argument, "If this can be done, the right of referendum is a dead letter in this state."

*Id.* at 672, 586 P.2d at 140 quoting *State ex rel. Kennedy v. Reeves*, 22 Wash.2d 677, 681–82, 157 P.2d 721, 723 (1945).

The essence of the *Swartout* decision is twofold: a declaration of emergency must contain basic underlying facts supporting a statement of urgency;[8] and any legislation passed in derogation of the people's right to referendum is void *ab initio*.[9]

*City of Spokane v. Harris*, 25 Wash.App. 345, 606 P.2d 291 (1980) is the most recent decision on point. Expanding upon and explaining its holding in *Swartout*, the court in effect restated the *Humiston* approach with a measure of clarity which leaves no doubt as to how HB 626 must be construed.

Whether a law is necessary for the immediate preservation of the public's health, safety and welfare is not so readily determined by looking to the law's subject matter. There must be a statement of some underlying fact to support the emergency or other facts of which the court can take judicial notice. This is particularly so in this case where the [previous] ordinance has been in effect 58 years before being amended.

25 Wash.App. at 348, 606 P.2d at 292.

Despite the wide swings evidenced in judicial thought over the course of years, what we have here is not so much a radical shift in substantive analysis as it is a shifting of the burden of persuasion. The standard rule adopted by Washington concerning challenges to constitutional validity of a statute is that "there is a presumption of the constitutionality of the legislative enactment unless its repugnancy to the consti-

---

7. Federal courts may rely upon intermediate appellate decisions where it is reasonable to assume that such opinions present the current status of state law. *See Tomlin v. Boeing*, 650 F.2d 1065, 1069 n.7 (9th Cir. 1981).

8. Lest a false impression be left, it should be noted that the Court was construing the City's charter which specified that emergency legislation must contain a "statement of urgency." The state constitution requires no such statement; only that the act be *in fact* of an emergent nature. The decision is cited primarily for its interest as a point of transition to the analy-

sis employed in *City of Spokane v. Harris, infra.*

9. The City's case was probably not helped by its display of incredible arrogance. In a letter to appellant, corporation counsel contended that:

The charter does not require an emergency to exist when an ordinance is passed to become immediately effective. It merely requires that the council declare that an emergency exists.

21 Wash.App. at 671, 586 P.2d at 140.

tution clearly appears or is made to appear *beyond a reasonable doubt." Water Dist. 105 v. State*, 79 Wash.2d 337, 340, 485 P.2d 66, 68 (1971) (emphasis added). Given the reasoning of the line of cases surveyed, however, this rule of construction would appear not to obtain where the electorate's right to referendum is at issue. The basis for this deviation is simple enough.

> All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights.

Wash. Const. art. 1, § 1.

██ Thus, where a conflict arises between the source of political authority (the people) and that body to which such power has been delegated (the legislature), there is no rule of reason which dictates that derivative powers be accorded weight over the primary source of such authority.[10] The burden in the instant case is upon the defendants. The weight of that burden is largely an unsettled question.

HB 626 is clear on its face that it contains no recitation of underlying facts upon which any court could glean any indication of legislative intent in declaring an emergency. Section 10 is nothing more than the most conclusory and cursory attempt to use "magic words" at the expense of supporting facts. Thus, if the act is to be saved at all, it will only be through resort to information of which the court may take judicial knowledge.[11]

Therein lies a unique dilemma. Defendants have posited no source materials of which this Court may take judicial notice except for certain materials of which are clearly outside the ambit of the Washington rule, *e.g.*, newspaper clippings; and reference to the history underlying the ill-fated Initiative 335 which tends to be somewhat less than conclusive on the issue.[12] Briefly stated, I have no basis upon which to read requisite supporting facts into HB 626 which are sorely lacking on its face. Having concluded that at least the burden of production, if not persuasion, in this area rests with the defendants, it would necessarily follow that the Act is constitutionally deficient as a matter of state law.

In the interest of preserving judicial federalism, however, I am hesitant to pass upon a question which is peculiarly local in nature and which is of such obvious impor-

---

**10.** In making this observation, I am aware of the longstanding rule in Washington that:

> there is a distinct difference between the operative effect of the Federal constitution and that of a state constitution. The Federal constitution is a *grant* of power, whereas the state constitution is a *limitation* upon legislative power.

*Union High School Dist. No. 1 v. The Taxpayers Etc.*, 26 Wash.2d 1, 7, 172 P.2d 591, 594 (1946). The quotation is frequently found in decisions resolving conflicts among the three branches of government. *See, e.g., Moses Lake Dist. v. Big Bend College*, 81 Wash.2d 551, 503 P.2d 86 (1972); *Yelle v. Bishop*, 55 Wash.2d 286, 347 P.2d 1081 (1959).

Where a direct conflict arises between the general authority of the legislature and the reserved powers of the electorate, the difference between a "grant" and a "limitation" may not be so distinct. The plurality decision in *Ford v. Logan*, 79 Wash.2d 147, 483 P.2d 1247 (1971) is worth reading in this regard.

**11.** Judicial notice, of which the courts may take cognizance, is composed of facts capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy and verifiable certainty. The court may "... resort to encyclopedias, authoritative works upon the subject, reports of committees, scientific bodies, and any source of information that is generally considered accurate and reliable ...."

*State ex rel. Humiston v. Meyers*, 61 Wash.2d 772, 779, 380 P.2d 735, 739–40 (1963). *See also Tyler Pipe Indus. v. Dept. of Revenue*, 96 Wash.2d 785, 796, 638 P.2d 1213, 1218 (1982).

**12.** The Initiative was passed by the voters on November 8, 1977 and subsequently struck down as unconstitutional in *Spokane Arcades v. Ray*, 449 F.Supp. 1145 (E.D.Wn.1978), *aff'd sub nom. Spokane Arcades v. Brockett*, 631 F.2d 135 (9th Cir. 1980), *aff'd* 454 U.S. 1022, 102 S.Ct. 557, 70 L.Ed.2d 468 (1981). Defendants ask this Court to take notice of the history of this measure as evidence of long standing state interest in the field of pornography and the need for decisive action upon exhaustion of the appellate process.

This position is not without merit, but in and of itself is insufficient to compensate for the dearth of underlying facts on the face of the Act.

tance to legitimate societal interests of the state. *See Lehman Brothers v. Schein,* 416 U.S. 386, 390–91, 94 S.Ct. 1741, 1743–44, 40 L.Ed.2d 215 (1974). In anticipation of this dilemma, defendants have suggested in argument that the validity of the emergency clause be determined by the Washington Supreme Court pursuant to the Federal Court Local Law Certificate Procedure Act codified at R.C.W. ch. 2.60. The relevant statute is as follows:

> When in the opinion of any federal court below (sic) whom a proceeding is pending, it is necessary to ascertain the local law of this state in order to dispose of such proceeding *and the local law has not been clearly determined,* such federal court may certify to the supreme court for answer the question of local law involved and the supreme court shall render its opinion in answer thereto.

R.C.W. 2.60.020 (emphasis added).

In the interests of economy as well as efficacious and final resolution, the certification avenue, at first glance, appears inviting. Upon reflection, however, utilization of this statute would clearly be an impermissible short cut. The essential bar lies in the requirement that the local law be unsettled. *Id.; see also Estate of Madsen v. C. I. R.,* 659 F.2d 897, 899 (9th Cir. 1981).

■ For reasons already given, I see nothing unsettled or uncertain about Washington's current analysis of the legal issue. The approaches embodied in *Humiston, supra* and *Harris, supra* are abundantly clear as to the prevailing judicial thought in Washington. Were this matter to be certified, therefore, the question placed before the State Supreme Court would not be one of law, as contemplated by the statute, but one of fact, *i.e.,* what facts are, or should be, available to the Court as a matter of judicial knowledge.[13] Should the state Supreme Court wish to assume the role of an original fact-finding body, that is well within its prerogative. *State ex rel. Distilled*

*Spirits Inst. v. Kinnear,* 80 Wash.2d 175, 187, 492 P.2d 1012, 1019 (1972). I am not inclined however, to cast that Court into what may be an unwanted, unwarranted, and arguably inappropriate role.

Faced with conflicting policy goals of proceeding to final resolution and allowing the state judiciary to chart its own position on a matter comprised solely of state questions free of outside interference, I defer to the latter. The litigants may yet reap the benefits of both of these goals by employing the Declaratory Judgments Act codified at R.C.W. ch. 7.24.

## IV. CONCLUSION

In summary, I conclude that HB 626 satisfies constitutional criteria as a matter of federal law subject to the reservation that the right to trial by jury may not be infringed in civil prosecutions. Because I interpret legislative intent in drafting the bill as mandating the same result, I need not reach any issues concerning severability.

With respect to the question of whether inclusion of the emergency clause violates prescriptions of the Washington constitution, this is a matter best left to ultimate resolution by the state judiciary.

Accordingly, plaintiffs' prayer for injunctive relief is DENIED. An appropriate Order directing entry of judgment will follow.

IT IS SO ORDERED.

---

13. Strictly speaking, such an inquiry would be a mixed question of fact and law reviewable as a question of law. *See Leschi v. Highway Comm'n,* 84 Wash.2d 271, 283–84, 525 P.2d 774, 783 (1974). Nonetheless, the Court would still be in a posture of seeking out and weighing external facts in an original capacity.